**IN THE UNITED STATES DISTRICTCOURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JEREMY QUINN, JR.,** | : | |
| | : | **Case No. 3:22-cv-661** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Judge Helmick** |
| | : | |
| **MAILROOM SUPERVISOR,** *et al.,* | : | |
| | : | |
| **Defendants.** | : | |

---

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants Annette Chambers-Smith, Andrew Rodriguez[1] and Harold May ("Defendants"), by and through counsel, hereby submit their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a).  Plaintiff's Complaint argues that the legal mail system utilized by the Ohio Department of Rehabilitation and Correction ("ODRC") violates his First Amendment Rights. Defendants assert that the same, as supported by the affidavits and documents provided herewith, is reasonably related to security and other legitimate penological objectives and therefore, is not a violation of Inmate Quinn's Constitutional rights. Following filing of his Complaint, Plaintiff has provided no facts that if true would create a disputed issue of fact concerning Defendants' established security and legitimate penological objective. Accordingly, Defendants seek summary judgment and a dismissal of this case. A Memorandum demonstrating good cause is attached.

---

[1] Defendant Andrew Rodriguez is the "Mailroom Supervisor" referred to in Plaintiff's Complaint.

2

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/ **Jennifer A. Driscoll***
JENNIFER A. DRISCOLL (0073472)
Senior Assistant Attorney General
Criminal Justice Section
Corrections Litigation Unit
30 E. Broad Street, 23rd Floor
Columbus, Ohio 43215
(614) 644-7233/(866) 514-0272 fax
Jennifer.Driscoll@OhioAGO.gov

*Counsel for Defendants*

2

**MEMORANDUM IN SUPPORT**

## I.      Introduction

Plaintiff Jeremy Quinn, #509-127 ("Plaintiff") is an incarcerated person currently confined by the ODRC and housed at the Southern Ohio Correctional Facility. Plaintiff initiated this lawsuit with "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See* [Doc. No. 1].

Defendants contend that ODRC's legal mail policy is constitutional and reasonably related to the security needs of the prison, which include combatting drug abuse and the conveyance of contraband into prisons via the legal mail system.  Drug abuse is "inevitable no matter what the guards do unless all prisoners are locked in their cells 24 hours a day and sedated." *Farmer v. Brennan*, 114 S. Ct. 1970; 511 U.S. 825, 858–59 (1994) (Thomas, J., concurring in judgment) (quotation and ellipses omitted).  Nationwide, from 2001 to 2018, the number of people who have died of drug or alcohol intoxication in state prisons has increased by more than 600%. (Schwartzapfel, Beth and Jimmy Jenkins, *Inside the Nation's Overdose Crisis in Prisons and Jails,* The Marshall Project, (07/15/2021)). Combating the conveyance of illegal substances such as marijuana, synthetic narcotics like K2, opioids, and bug spray is an on-going security challenge for ODRC.  (Kucinic Aff., ¶ 6; (Def. Ex. 1), Buchanan Aff., ¶ 4, Def. Ex. 2). From 2020 until 2023, ODRC has experienced a minimum of 7,046 drug contraband incidents within its institutions.  (Kucinic Aff., ¶ 16). However, with the implementation of Policy 75-MAL-03[2], Major Contraband -Drugs intercepted through Legal Mail has decreased sharply. In 2020, there were 370 incidents of contraband being intercepted. In 2021, there were 228. In 2022, there were 22. In 2023, there were only 9.  (Kucinic Aff., ¶ 17).

---

[2] Attached to Buchanan Aff., (Ex. 2-5).

Prisoners and their conspirators continue to show great ingenuity. Every time the State thwarts a new conveyance technique, the conveyance industry changes tactics and the State has to "build a better mousetrap for the next thing." (Welsh- Huggins, Andrew, *Ohio prisons ramping up fight against flow of contraband*, Associated Press (Apr. 12, 2022) ("Welsh-Huggins")).

In the past, in order to combat contraband being sent through the mail, ODRC had staff conduct visual searches of incoming mail, utilized canines; remove stamps from the mail, burn envelopes, and refuse letters with perfume or glitter. (Buchanan, ¶ 7; Welsh- Huggins). As part of building a better mouse trap, on July 27, 2020, ODRC began copying all non-legal mail in select institutions, while exempting legal mail[3]. (Buchanan Aff., ¶ 7). These measures were successful in suppressing the flow of contraband into the institutions. Data collected showed an immediate increase in the detection of contraband coming through the mail and a subsequent decrease of contraband in the institutions. (Kucinic Aff., ¶ 16-17). These measures provided an instant partial solution for mail-based conveyance of contraband but did nothing to halt the flow of contraband entering the facilities via legal mail protocols. (Kucinic Aff., ¶ 15; Buchanan Aff., ¶ 7-8).

The illicit contraband industry adapted and began soaking the paper itself with drugs and utilizing the legal mail system.  (Kucinic Aff., ¶ 15; Buchanan Aff., ¶ 7-9). Under ODRC's prior legal mail policy, legal mail (defined as mail addressed to an inmate clearly bearing the return address of an attorney-at-law, court, or legal organization which provides direct legal services[4])

---

[3] For additional information regarding the timeline and steps ODRC has taken to combat the introduction of contraband into the prison system through the U.S. mail, please see the ODRC Mail Timeline Summary, attached to the Buchanan Aff. as Buchanan Aff. Ex. 2 and OMPC Presentation, attached to the Buchanan Aff. as Buchanan Aff. Ex. 3).

[4] Pursuant to the Ohio Administrative Code §5120-9-17(B)(2)(eff. 4/8/22):  "Legal mail" is mail addressed to an inmate clearly bearing the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the correctional institution inspection committee that is marked with a valid control number provided by the department. It may be opened and inspected for contraband only in the presence of the inmate-addressee. "Legal mail" does not include postcards from a court of law that indicates fees and/or fines owed by the inmate-addressee. If mail is received from any of the groups listed in this paragraph without a valid control number, then it may be treated as a regular, non-legal mail, as set forth in paragraph (B)(1) of this rule.

"may be opened and inspected for contraband only in the presence of the inmate-addressee." (Buchanan Aff., ¶ 7; OAC § 5120-9-17(B)(2019); *Rodgers v. Driesbach*, 2021 U.S. Dist. LEXIS 42280, *5-6).  Mail was considered to be "legal" if it was stamped as such and contained a seemingly legitimate return address.  *Id.*  The addresses of legal entities were easily duplicated because mail addressed to an incarcerated person clearly bearing the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the Correctional Institution Inspection Committee (CIIC) was automatically designated as "legal mail." (Kucinic Aff., ¶¶ 7, 14).

ODRC has intercepted numerous correspondences from illegal actors that provided step-by-step instructions on creating mail which would appear as if it came from a legitimate legal source. (Kucinic Aff., ¶ 8). Drugs began showing up in the paper of exempted legal correspondences, including mail with return addresses from the courts.  (Kucinic Aff., ¶ 7; Welsh-Huggins).  Inmates would sell each drug-soaked paper in strips, netting anywhere from $1,000 to $5,000 for each 8.5 by 11-inch standard piece of paper.  (Kucinic Aff., ¶ 9).

ODRC institutions throughout Ohio have intercepted counterfeit legal mail with addresses from real and fake law firms, the Ohio Innocence Project, the Ohio Public Defender's Office, and various Courts. (Kucinic Aff., ¶ 7). From June through August 2021, one person alone sent at least thirty-four (34) "legal mail" packages, each containing between 30 and 80 sheets of drug-soaked paper, into Ohio prisons.  Under the old system, this counterfeit legal mail was marked as exempt from photocopying and digitizing and only subjected to a visual inspection because it had the same appearances as that of sent from a legitimate legal source. (*Id.  See also* Associated Press, *Woman accused of conveyance drug-soaked papers into Ohio prisons,* (March 24, 2022)

(https://www.10tv.com/article/news/crime/woman-accused-of-conveyance-drug-soaked-papers/530-2f800a45-5483-42ea-be6a-fe2162182835)).

Formally commencing in November 2020, the ODRC Legal Mail Project was tasked with finding a solution to contraband being smuggled into the prisons via abuses to the legal mail policy. (Kucinic Aff., ¶ 10). It held meetings with statewide ODRC stakeholders, including legal counsel, Information Technology (IT), the Chief Inspector's Office, Investigators, and mail room staff. ODRC also reached out to the external stakeholders, including state and federal Clerks of Courts. (Kucinic Aff., ¶ 11). The team examined how other States and the Federal Prison System address contraband coming in by mail. After considerable research, and in a manner which they believe to be the best balance between an inmate's First Amendment rights regarding legal mail and ODRC's need to halt the flow of contraband into its system, ODRC instituted Policy 75-MAL-03.[5] (*Id.;* 75-MAL-03).

As of October 4, 2021, Ohio implemented a system-wide legal-mail program which requires all legal mail senders to "register, obtain and use valid control numbers on all legal mail sent to incarcerated individuals." (Kucinic Aff., ¶ 13; Legal Mail, Ohio Department of Rehabilitation and Correction, https://archive.is/0iPJA.) Mail coming from the courts (or made to appear as if it has come from the courts) was specifically included in this program because ODRC has experienced so many inmates receiving fake legal mail which has contained contraband. (Kucinic Aff., ¶ 14-15).

On October 4, 2021, an ODRC communication was sent to all ODRC inmates through a digital messaging system called Jpay, which provided notice regarding the implementation of the legal mail policy. (Buchanan Aff., ¶ 10, Ex. 4). In addition, the information regarding the change

---

[5] On April 8, 2022, an amendment to the Ohio Administrative Code was adopted. The changes are reflected in 75-MAL-03.

of policy was listed on ODRC's website.  *See* Legal Mail, Ohio Department of Rehabilitation and Correction, https://archive.is/0iPJA.

The Ohio Administrative Code mandates "[a]ll mail, including electronic mail, other than legal mail, shall be opened and may be read or copied in the institution mail office and inspected for the presence of contraband, unauthorized forms of funds, and other threats to the security and safety of the institution." O.A.C. § 5120-9-17(B)(1). O.A.C. § 5120-9-17(B)(2), which aligns with the new mail policy, defines legal mail as "mail addressed to an inmate clearly bearing the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the correctional institution inspection committee ***that is marked with a valid control number*** provided by the department."  (Buchanan Aff., ¶ 11) (Emphasis added). "If mail is received from any of the groups listed in this paragraph without a valid control number, then it *may* be treated as a regular, non-legal mail, as set forth in paragraph (B)(1) of this rule." Thus, if legal mail addressed to an inmate does not have a control number per ODRC policy, it can be opened and copied before it is delivered to the inmate. (See also, *El-Barseem K. Allah v. Chambers-Smith*, 2023 U.S. Dist. LEXIS 104828, *4).

Under the new mail process that began in January 2024, ODRC provides one mailing address for the entire incarcerated population - the Ohio Mail Processing Center (OMPC) in Youngstown. There, the mail is x-rayed and sorted. Mail inspectors at OMPC, now open and inspect regular mail for contraband before scanning, performing quality assurance checks, and sending the copied mail to the incarcerated person's individual tablet.  Inmates can view their mail via their tablets.  The mail remains on their tablets until they either close their accounts or delete the mail.  (Buchanan Aff., ¶ 11).

Mail containing a legal mail stamp and marked with a valid control number, including mail

coming from the courts, is treated differently. Incoming legal mail is addressed to the inmate at his or her institution, received by the institutional mailroom, visually inspected by ODRC staff, and delivered directly to the inmate. The legal mail is opened by ODRC staff in front of the inmate and visually inspected for contraband without reading the legal mail. The inmate is allowed to retain the original documents contained in the legal mail. (Buchanan Aff., ¶ 11).

Mail containing a "legal mail" stamp without a control number is treated in the same manner as regular mail, meaning it is opened outside of the presence of the inmate and delivered by digital means. (Buchanan Aff., ¶ 11). The abuse of the old legal mail system allowed contraband, specifically undetectable illicit drugs, into the facility because mail with a court address was treated as privileged correspondence. (Kucinic, ¶ 14-15). ODRC determined that not including the courts with the same requirements as other legal mail would circumvent the purpose of the new policy. Individuals could simply forge a court's return address on the envelope instead of an attorney's and slip contraband into the institution. (Kucinic, ¶ 14-15).

ODRC's shift in policy to changing the location of mail inspection of documents from within the institution to outside the facility perimeter has yielded clear, evidenced-based, safety and security benefits supported by the data. (Buchanan Aff., ¶ 12; Kucinic, ¶ 17). Likewise, requiring legal mail to have valid control numbers has yielded clear, evidence-based safety and security benefits supported by the data. The conveyance of contraband, including drugs, has been significantly reduced. (Kucinic Aff., ¶ 16-17; Buchanan Aff., ¶ 12)[6]. Prison security and safety has been enhanced when off-site mail inspectors inspect the mail because the offsite inspection keeps the contraband from physically entering the facility and increases the likelihood that the

---

[6] Other benefits include improved mail delivery, the removal of hundreds of invalid registrations for attorneys and law firms, and the reduced cost of delivery fees for friends and family of incarcerated individuals. See Buchanan Aff., ¶ 12.

contraband is discovered. (Buchanan Aff., ¶ 12; Kucinic, ¶ 17). Further, by conducting the inspections offsite, the corrections officers inside the perimeter are protected from contact with illicit or dangerous substances and can utilize the time previously spent delivering and inspecting mail for other activities.  (Buchanan Aff., ¶ 12; Kucinic, ¶ 18).

## II.      Law and Argument

### A.      Standard of Review: Fed. R. Civ. P. 56(a).

The party moving for summary judgment has the burden of conclusively showing no genuine issue of material fact exists. *Baker v. Roberts Exp., Inc.,* 800 F.Supp. 1571, 1573 (S.D. Ohio 1992). The question on summary judgment is whether there is a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S. Ct. 2505, 2507 (1986).  The evidence against the motion for summary judgment must be more than the nonmovant's own pleadings and affidavits. *Smith v. Campbell*, 250 F.3d 1032, 1036 (6th Cir. 2001). The absence of additional evidence to support a party's position beyond his own self-serving testimony is insufficient to overcome a motion for summary judgment. *See Bryant v. Mahoning County Bd. of Comm'rs*, No. 4:05 CV 2783, 2007 WL 1725314, at *7 (N.D. Ohio June 13, 2007); *see also Evans v. Techs. Application & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1994). Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Expert Masonry, Inc. v. Boone Cty, Ky.,* 440 F.3d 336, 341 (6th Cir. 2006). Because there is no evidence in the present case upon which a reasonable jury could return a verdict in favor of the Plaintiff, Defendants should be granted judgment as a matter of law.

**B.      Section 1983 Claim.**

To maintain a claim under § 1983, a plaintiff must establish that he was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48; 108 S.Ct. 2250 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). This is because § 1983 "is not itself a source of substantive rights," but instead merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979). Thus, the first step in evaluating a § 1983 claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394; 109 S.Ct.1865 (1989); *Baker*, 443 U.S. at 140.

**C.      Defendants are Entitled to Qualified Immunity.**

Government actors generally receive qualified immunity in § 1983 actions. The Supreme Court has identified three purposes underlying this grant of immunity. First, qualified immunity "protect[s] the public from unwarranted timidity on the part of public officials." *Richardson v. McKnight*, 521 U.S. 399, 408, 117 S. Ct. 2100, 138 L. Ed. 2d 540 (1997). Second, the doctrine helps "to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." *Id.* (internal quotation marks omitted). Third, qualified immunity reduces the chance that lawsuits will distract from the performance of public duties. The doctrine seeks to balance the protection of constitutional rights and the "substantial social costs" of imposing liability on public officials. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).  Once a Defendant has raised the qualified immunity defense, the Plaintiff bears the burden of showing that they are not entitled to qualified immunity.  *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). Here, Plaintiff has not and cannot meet this burden.

The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Miller v. Sanilac Cty.*, 606 F.3d 240, 247 (6th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). State actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Harlow*, 457 U.S. at 818. The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986).

To determine if a defendant is entitled to qualified immunity, two questions must be asked: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation of which a reasonable person would have known?" *Id*. Unless the answer to both is yes, government officials are protected by the doctrine of qualified immunity. *Id*.

In the instant matter, the issue of qualified immunity must be framed as "whether, at the time of the Defendants' conduct, was it clearly established that ODRC Policy 75-MAL-03 violated Plaintiff's First Amendment right to receive legal mail." Absent clearly established United States Supreme Court or Sixth Circuit precedents, the response must be "no," which entitles Defendants to qualified immunity. (see *Bell v. Wolfish*, 441 U.S. 520 (1979). Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *Hunter v. Bryant*, 502 U.S. 224, 229, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991). Moreover, any analysis of qualified immunity in the context of prisons should be done with the understanding that a court normally gives great deference to prison officials in matters of "prison safety, security and discipline." *Wood v.*

11

*Clemons*, 89 F.3d 922, 928 (1st Cir. 1996).

It is beyond dispute that prison officials have a reasonable justification to establish 75-MAL-03 to prevent the introduction of contraband through the legal mail system. (*see generally*, Kuninic Aff.; Buchanan Aff.,). It is beyond dispute that 75-MAL-03 was carefully crafted after consultation with statewide ODRC stakeholders, including legal counsel, Information Technology (IT), the Chief Inspector's Office, Investigators, and institutional mail room staff, and external stakeholders, including state and federal Clerks of Courts. (Kucinic Aff., ¶ 11). It is beyond dispute that 75-MAL-03 conforms with Ohio Administrative Code § 5120-9-17 (B)(2). Further, as of the date of the filing of the lawsuit, there has been no determination by a U.S. District Court, Federal Court of Appeals, or Supreme Court regarding the constitutionality of the policy. Therefore, Plaintiff cannot prove that, at the time of the Defendants' conduct, Defendants knew or should have known that they were violating a clearly established constitutional right by enforcing ODRC Policy 75-MAL-03. As such, Defendants are entitled to qualified immunity.

Further, when determining whether an official's conduct is entitled to qualified immunity, the Courts should look to whether officials relied upon the advice of counsel before undertaking the complained upon action. *See England v. Hendricks,* 880 F.2d 281, 284 (10th Cir. 1989). A government official may demonstrate that he or she knew nor should have known the relevant legal standard if they relied upon the advice of counsel. *Gomes v. Wood,* 451 F.3d 1122, 1134 (10th Cir. 2006). In the instant matter, prior to the implementation of 75-MAL-03, ODRC officials consulted with counsel. (Kucinic Aff., ¶ 11).

Having raised the issue of qualified immunity, Plaintiff must demonstrate that these parties are not entitled to the same. Plaintiff cannot do so. Therefore, Defendants are entitled to summary judgment in their favor.

12

### D. First Amendment and Legal Mail

Prison walls do not form a barrier separating prison inmates from the protections of the Constitution; however, the Supreme Court recognizes that "these rights must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration. *Thornburgh v. Abbott*, 490 U.S. 401, 407 (citing *Turner* v. *Safley*, 482 U.S., at 85). A prisoner's right to receive mail is protected by the First Amendment, but prison officials may impose restrictions that are reasonably related to security or other legitimate penological objectives. *See Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992). "[W]e have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Bell v. Wolfish*, 441 U.S. 520, 547(1979). ODRC acknowledges that there is a heightened concern with allowing prison officials unfettered discretion to open and read an inmate's legal mail.  *Sallier v. Brooks,* 343 F.3d 868, 873-874 (6th Cir. 2003).  However, the Sixth Circuit has noted, "prison officials may open prisoners' incoming mail pursuant to a uniform and evenly applied policy with an eye to maintaining prison security." *Lavado v. Keohane*, 992 F.2d 601, 607 (6th Cir. 1993). Prison officials who open and read incoming mail in an arbitrary and capricious fashion violate a prisoner's First Amendment rights. *See Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986).  Defendants aver that there is nothing arbitrary or capricious about ODRC's legal mail policy. (Kucinic Aff., ¶ 11; Buchanan Aff., ¶ 11; Policy 75-MAL-03).  Every inmate is subject to the same policies and procedures.  (*Id.*)

"A prisoner's right to receive mail is protected by the First Amendment, but prison officials may impose restrictions that are reasonably related to security or other legitimate penological objectives." *Sallier,* 343 F.3d at 873 (citing *Knop,* 977 F.2d at 1012).  That includes opening legal

mail if the normal contraband detection techniques failed to disclose contraband, and "if there was a reasonable possibility that contraband would be included in the mail." *Wolff v. McDonnell*, 418 U.S. 539, 574, 41 L. Ed. 2d 935, 94 S. Ct. 2963 (1974).  Further, the Supreme Court has already found that the State may require legal communications to be specifically identified.

> [I]t entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment. It would also certainly be permissible that prison authorities require that a lawyer desiring to correspond with a prisoner, *first* identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar.

*Wolff,* 418 U.S. at 576-577.  In requiring all legal mail be identified by a control number or otherwise be treated as regular mail, Defendants assert that ODRC's mail policy appropriately imposes restrictions reasonably related to security and other legitimate penological objectives. (Kucinic Aff., ¶ 13-17).  The implementation has shown a clear beneficial result.  *Id.*

Utilizing the two-step test set forth in *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, (1987), the Court must determine if the policy utilized by ODRC regarding legal mail is reasonably related to legitimate penological interests." *Id.*[7] If the answer to that is "Yes", then it passes constitutional muster.  *Id.*

First, ODRC must demonstrate a valid, rational connection between the prison regulation and the legitimate interest put forth to justify it.  If that connection exists, then under the second step, the court must determine whether (i) whether inmates have an alternative means of exercising the right; (ii) the burden on prison resources that would be imposed by accommodating the right; and (iii) whether there are alternatives to the regulation that fully accommodate the inmate's rights at *de minimis* cost to valid penological objectives. *Id*. *Turner* does not require prisons to use the

---

[7] The Supreme Court reiterated that when addressing a prisoner's first amendment rights, the relevant inquiry is whether the actions of prison officials were "reasonably related to legitimate penological interests. *Thornburgh v. Abbott*, 490 U.S. 401, 409

least restrictive means possible to further legitimate penological interests. *Id*.  The alternatives need not be ideal; they need only be available.  *Overton v. Bazzetta*, 539 U.S. 126, 135; 123 S.Ct. 2162 (2003).

### 1.    *Turner's* first step:  Rational Connection

Under *Turner's* first step, the record supports a rational connection between improving the means of verifying the source of legal mail through the use of Control Numbers and the safety and security problems posed by inmates and outsiders using the legal mail system to smuggle contraband.  As the affidavits of Vinko Kucinic and Tim Buchanan demonstrate, ODRC's old legal mail policy was being abused and it allowed contraband into the institutions. (Kucinic Aff., ¶ 8; Buchanan Aff., ¶ 5-8).  The detection of contraband conveyed through legal mail was primarily limited to visual inspections, which was not effective. (Kucinic Aff., ¶ 7; Buchanan Aff., ¶8). Some of these abuses involved the creation of fake attorney accounts, and the falsification of return addresses of courthouses and clerks of courts in order to obtain treatment as Privileged Correspondence. (Kucinic Aff., ¶ 7). Reducing the amount of counterfeit legal mail erroneously treated as privileged correspondence has enhanced prison security and safety.  (Kucinic Aff., ¶ 16-17; Buchanan Aff, ¶ 12).  That demonstrates a rational connection between ODRC's legal mail policy and its interest in prison security and safety. (*Turner*, 482 U.S. at 89).  Therefore, the first step of the *Turner* analysis is satisfied.

### 2.    *Turner* second step: (i)There are no alternative means of meeting the legitimate penological interests; (ii) failure to utilize the mail policy will produce a detrimental ripple effect; and (iii) Plaintiff cannot provide an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests.

There are three factors that the court must consider under the second step of *Turner*.

### i. *There are no alternative means.*

First, "[w]ere it shown that no alternative means of [exercising the circumscribed right] existed. . . it would be some evidence that the regulations were unreasonable." (*Overton,* 539 U.S. at 135). In the instant matter, Plaintiff has an alternative means of ensuring that his First Amendment rights are not infringed upon. Control Numbers are easily obtained upon request of the law firm, legal department, or courthouse.  (Buchanan Aff., ¶ 11). When used, Control Numbers allow the Inmates to communicate with attorneys and courts just as they did under ODRC's old mail policy. (Buchanan Aff., ¶ 11). Although it is true that this plaintiff cannot compel this Court to use a control number, the alternative is available, which is all that *Turner* requires. (*Overton,* 539 U.S. at 135 citing *Turner*, 482 U.S. at 90; *Turner*,  at 90).

### ii. *Detrimental ripple effect.*

Second, the Court must consider the impact that accommodation of the asserted right would have on guards, other inmates, the allocation of prison resources, and the safety of visitors. See *Turner*, 482 U.S., at 90. The court "should be particularly deferential to the informed discretion of corrections officials" when an accommodation "will have a significant 'ripple effect' on fellow inmates or on prison staff." *Turner*, 482 U.S. at 90. "[J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. *Bell v. Wolfish*, 441 U.S. 520, 548 (1979).

The new policy has significantly reduced contraband, including drugs, from being smuggled into ODRC.  (Kucinic Aff. ¶ 16-17; Buchanan Aff., ¶ 12).  The policy allows corrections officers to spend more time addressing prison safety and security issues and less time addressing

16

the delivery of mail or the search for contraband smuggled through the mail. (Kucinic Aff. ¶ 18; Buchanan Aff., ¶ 12). Not enforcing the policy would cause a negative ripple effect on other inmates and prison staff by returning to ineffective contraband detection methods, creating the potential of increased contraband in the prisons, increased exposure to staff coming into contact with illicit and dangerous substances, and increased time spent by staff searching for contraband potentially contained in the legal mail. (Kucinic Aff, ¶ 15-18; Buchanan Aff., ¶ 12 ).

### iii. No valid alternative methods.

Third, Plaintiff has failed to "point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 91. If mail containing a return address from a court must automatically be considered "legal mail" even without the corresponding control number, then anyone can circumvent the reason for the policy simply by forging the envelope and/or correspondence. (Kucinic Aff. ¶ 7; Buchanan Aff., ¶ 7). There is no alternative practice which can be achieved at a *de minimis* cost to the valid penological interest of keeping contraband out of the institution. (Kucinic Aff., ¶ 11).

The Third Circuit Court of Appeals has upheld a similar legal mail policy from Pennsylvania against a First Amendment challenge. See *Fontroy v. Beard*, 559 F.3d 173, 174 (3d Cir. 2009). As the *Fontroy* court points out, the Supreme Court's ruling in *Wolff* "weighs in favor of upholding the constitutionality" of the Pennsylvania Department of Corrections' use of control numbers in its legal mail policy:

> We think it entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment. It would also certainly be permissible that prison authorities require that a lawyer desiring to correspond with a prisoner, first identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar.

*Fontroy*, 559 F.3d at 183 (quoting *Wolff,* 418 U.S. at 576-77). Here, like in *Fontroy*, the control

numbers ODRC require to designate an item as "legal" act as both a special mark identifying communications as originating from an attorney or court and also as a means of identifying the attorney or court to prison officials in order to assure that the letters marked privileged are actually from members of the bar or from a court. *Id.*

Because ODRC's mail policy is not unconstitutional, it does not infringe upon Plaintiff's first amendment rights regarding legal mail. Therefore, Plaintiff can prove no set of facts which would render him a favorable judgment. Moreover, Plaintiff does not factually dispute Defendants' safety concern, or penological interest. Defendants' motion for summary judgment should be granted and Plaintiff's Complaint should be dismissed, with prejudice.

### E.      First Amendment and Access to the Courts

To the extent that the Court reads Plaintiff's Complaint as an Access to Court Claim, such an allegation fails similarly. Prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977). In order to state a claim for interference with access to the courts, a plaintiff must show actual injury. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (per curiam). "The Supreme Court held that an inmate claiming that he was denied access to the courts must show that he suffered an actual litigation related injury or legal prejudice because of the actions of the defendants… not every infringement or inconvenience suffered by the litigating prisoner implicates this constitutional right." *Thomas v. Rochell*, 47 Fed. Appx. 315, 317 (6th Cir. 2002) (*Citing Lewis v. Casey*, 518 U.S. 343, 349-51 (1996)) (See also *McGowan v. Erdos*, 2023 U.S. Dist. LEXIS 57848, *13 (S.D. Ohio, Mar. 31, 2023). "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) (citation omitted). Further, "isolated instances of

18

interference with prisoners' mail" may not rise to the level of a constitutional violation under the First Amendment." See *Johnson v. Wilkinson*, No. 98-3866, 2000 U.S. App. LEXIS 21036 (6th Cir. 2000).

In this case, Plaintiff has neither pleaded nor presented evidence of actual prejudice towards him in any litigation. Plaintiff simply notes that the mailroom is "opening, copying and reading my documents outside my view, without my permission. And I'm not getting the original documents back." (Complaint, Doc. 1, PageID 6). He simply states that any documents he gets from a State or Federal agency pertaining to his criminal conviction he wants to go straight to him. Based upon the reasonings set forth by the Ohio Supreme Court, Plaintiff cannot demonstrate that ODRC's new legal mail policy prejudiced him in any litigation. Summary judgment is appropriate because he cannot demonstrate that the new legal mail policy prejudiced his access to the courts.

**F.      Plaintiff Fails to Allege any Constitutional Violation by Defendants.**

Plaintiff has failed to identify any actual prejudice. Plaintiff, in opposition to Defendants' Motion to Dismiss, has cited many cases that outline the importance of inmates receiving legal mail in an appropriate and constitutional manner. Defendants agree and acknowledge this important right. The ODRC mail policy, which recognizes the need for privileged communication, is established to protect the inmate's rights and protect inmates from the overflow of illegal substances in the prison. The legal mail policy applies to all inmates, whether they are represented or pro se. Plaintiff asserts that Defendants violated his First Amendment rights, presumably an inmate's right to receive mail. The Ohio Northern District Court has previously reviewed ODRC's mail policy and determined it "does not violate [an inmate's] First Amendment right," emphasizing that prison officials may "impose [mail- related] restrictions that are reasonably related to security or other legitimate penological objectives." *Whitman v. Gray*, 2022 U.S. Dist. LEXIS 38050, 2022

19

WL 621553 at *3 quoting *Sallier,* 343 F.3d at 873. Further, this Court determined that compliance with the ODRC's legal mail policy "satisfies constitutional requirements." *Id*. at *4. The Third Circuit Court of Appeals has also upheld a similar legal mail policy against a First Amendment challenge. *Fontroy v. Beard*, 559 F.3d 173, 174 (3d Cir. 2009). As the *Fontroy* court points out, the Supreme Court's ruling in *Wolff* "weighs in favor of upholding the constitutionality" of the Pennsylvania Department of Corrections' use of control numbers in its legal mail policy:

> We think it entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment. It would also certainly be permissible that prison authorities require that a lawyer desiring to correspond with a prisoner, first identify himself and his client to the prison officials, to assure that the letters marked privileged are actually from members of the bar.

*Fontroy*, 559 F.3d at 183 quoting *Wolff,* 418 U.S. at 576-77. Here, the control numbers that ODRC requires act "as both a special mark identifying communications as originating from an attorney and also as a means of identifying the attorney to prison officials in order to assure that the letters marked privileged are actually from members of the bar." (internal quotations omitted) *Id.* Contrary to Plaintiff's argument, *Wolff* supports ODRC's legal mail policy, and Plaintiff's First Amendment claim should be dismissed.

Plaintiff further asserts violations of the Fifth and Fourteenth amendments, presumably of his right to due process and access to the courts. Even if the Plaintiff's vague allegations are to be considered a deprivation of a property interest without procedural due process action under § 1983, he must plead and prove that the state remedies for depriving him of that protected property interest were inadequate. *Vicory v. Walton*, 721 F. 2d 1062, 1065-66 (6th Cir. 1983). Here, Plaintiff merely asserts that he disagrees with ODRC's new policy. Moreover, Plaintiff has not plead sufficient facts to determine if he had a protected property interest in what was sent from the court. Plaintiff allegations based purely on legalese without facts do not amount to a claim upon which relief can

20

be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544.

In order to prevail on a claim that he was denied access to the courts, Plaintiff "must plead and prove prejudice stemming from the asserted violation." *Pilgrim v. Littlefield,* 92 F.3d 413, 416 (6th Cir. 1996); *see also Harbin-Bey v. Rutter,* 420 F.3d 571, 578 (6th Cir. 2005) ("Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline."). Here, Plaintiff has not alleged any actual prejudice he has suffered as a result of ODRC's legal mail policies and procedures.

### G.      Defendants are entitled to Eleventh Amendment Immunity

To the extent that Plaintiff seeks monetary damages from Defendants in their official capacity, the Eleventh Amendment (as well as Ohio's Sovereign Immunity) bars his claims. The Eleventh Amendment bars all suits against a State or one of its agencies or departments to which it does waive immunity, regardless of the nature of the relief sought. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984); *Missouri v. Fiske*, 290 U.S. 18, 27 (1933).  In general, the Eleventh Amendment bars a suit in federal court against state officials when "the state is the real, substantial party in interest." *Id*. at 101. "It is well established that § 1983 does not abrogate the Eleventh Amendment." *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013) (citing *Quern v. Jordan*, 440 U.S. 332, 341 (1979)).

Where a State has not waived its immunity, and there has been no Congressional abrogation, the Eleventh Amendment acts as a jurisdictional bar to a federal court lawsuit against a state. *Wolfel v. Morris*, 972 F.2d 712, 718 (6th Cir. 1992). Ohio has not waived its sovereign immunity, and Congress did not disturb the State's Eleventh Amendment immunity when it passed 42 U.S.C. § 1983. *Id*. at 718; *McCormick v. Miami Univ.*, 693 F.3d 654, 664 (6th Cir. 2012); *Mackey v. Cleveland State Univ.*, 837 F. Supp. 1396, 1403 (N.D. Ohio 1993). To the extent that

21

Plaintiff sues Defendants in their official capacities, the Eleventh Amendment bars those claims for monetary damages.

## III.    CONCLUSION

Defendants move this Honorable Court to grant summary judgment in their favor as to all of Plaintiff's claims against them. There are no genuine disputes as to any material facts.  Even when construing all evidence in Plaintiff's favor, reasonable minds can only conclude that Plaintiff cannot satisfy the elements of his claims.  For the above reasons, Defendants respectfully request that this Court grant their motion for Summary Judgment; assess costs to Plaintiff; and order any other relief deemed necessary.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ **Jennifer A. Driscoll***
JENNIFER A. DRISCOLL (0073472)
Senior Assistant Attorney General
Criminal Justice Section
Corrections Litigation Unit
30 E. Broad Street, 23rd Floor
Columbus, Ohio 43215
(614) 644-7233/(866) 514-0272fax
Jennifer.Driscoll@OhioAGO.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2024, a copy of *Defendants' Motion for Summary Judgment* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ ***Jennifer A. Driscoll***
JENNIFER A. DRISCOLL (0073472)
Senior Assistant Attorney General