*JEREMY J. QUINN*

*vs.*

*JOHN/JANE DOE*

Deposition of

**Brian Wittrup**

April 10, 2024



614.460.5000 | www.priohio.com | pri@priohio.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEREMY J. QUINN, JR.,           )
                                )
        Plaintiff,              )
                                )
    vs.                         )    Case No.
                                )    3:22-CV-661
JOHN/JANE DOE, ET AL.,          )
                                )
        Defendants.             )

DEPOSITION

of BRIAN WITTRUP

Taken at the offices of
Ohio Department of Transportation
1980 West Broad Street
Columbus, Ohio 43223

on April 10, 2024, at 10:11 a.m.

Reported by: Julia Lamb, RPR, CRR

-=0=-

APPEARANCES:

Robert Salem
UNIVERSITY OF TOLEDO CIVIL ADVOCACY CLINIC
1825 West Rocket Drive
Toledo, Ohio 43606
419.530.4236
robert.salem@utoledo.edu

        on behalf of the Plaintiff.


Jennifer A. Driscoll
Assistant Attorney General
OHIO ATTORNEY GENERAL, DAVE YOST
Criminal Justice Section/Corrections Unit
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
614.644.7233
Jennifer.Driscoll@OhioAGO.gov

        on behalf of the Defendants.


ALSO PRESENT:

John Young, Law Student
Megan Anderson, Law Student
Linda Dill
Byron Turner


                    -=0=-

STIPULATIONS

It is stipulated by and between counsel for the respective parties that the deposition of BRIAN WITTRUP, the Witness herein, called by the Plaintiff under the applicable Rules of Federal Civil Court Procedure, may be taken at this time by the stenographic court reporter and notary public pursuant to notice; that said deposition may be reduced to writing stenographically by the court reporter, whose notes thereafter may be transcribed outside the presence of the witness; and that the proof of the official character and qualification of the notary is waived.

-=0=-

INDEX OF EXAMINATION

PAGE

BY MR. YOUNG:                                    5
BY MR. SALEM:                                   19
BY MR. YOUNG:                                   30
BY MR. SALEM:                                   39

INDEX OF EXHIBITS

EXHIBIT              DESCRIPTION              PAGE

   1      Ohio Administrative Code Rule    12
          5120-9-17 Incoming Mail

BRIAN WITTRUP

being first duly sworn, as hereinafter certified,

deposes and says as follows:

CROSS-EXAMINATION

BY MR. YOUNG:

Q.  Good Morning, Mr. Wittrup.

A.  Good morning.

Q.  My name's John Young.  I'm a law student
at the University of Toledo College of Law.  I'm
here with the University of Toledo Legal Clinic.
I have my supervisor professor Robert Salem and
one of my colleagues Megan Anderson with me as
well.  I'll primarily be doing the talking, but
I may or may not miss something and Rob may jump
in and catch me.

I understand you've been deposed before
probably many times in your role, including by
Rob?

A.  Uh-huh.

Q.  But just to kind of laying the ground
rules here, you do understand you're testifying
under oath today and that you're legally
obligated to tell the truth?

A.  I do.

Q.  You understand you must provide verbal responses to questions, no shaking your head or any sort of noise responses, but yes-or-no answers.  Do you understand that?

A.  I do.

Q.  If you hear a question you do not understand or you're unable to hear my question, please feel free to ask me to repeat the question, rephrase the question.  Do you understand that?

A.  I do.

Q.  All right.  And then if at any point you would like to correct an answer to a question or -- you know, current question or past question, you have the ability to do so.  You understand that?

A.  I do.

Q.  Okay.  And then for the sake of Julia's sanity, do not start an answer to a question until I'm finished asking the question.  Do you understand that?

A.  I do.

Q.  And then if you want to take a break at any point, just let me know and we will.  If

we're in the middle of a question, we'll try to get that done first before we take a break.  Do you understand that?

A.  I do.

Q.  Wonderful.  And then for the sake of the record I wanted to be clear.  I will be using ODRC in place of Ohio Department of Rehabilitation and Correction.  As I'm sure you're well aware, a little bit of a mouthful.

A.  I do know that.

Q.  I'm sure.

All right.  Mr. Wittrup, what's your position with ODRC?

A.  I'm the chief of strategy and policy.

Q.  And how long have you been in that position?

A.  Since December of 2019.

Q.  Okay.  And what do your job duties look like in that position?

A.  Primarily -- first of all, I work directly for the director.  I'm her policy and strategy advisor.  I handle the strategic plan for the entire agency.  So all divisions have to provide a plan of action, what they do, and then

I follow and make sure that they're complying with it.  I handle some administrative functions for the director, a lot of her emails and correspondence I respond on her behalf or make sure other people take care of what they must do so.  I'm sort of her blocker on scheduling because if not her schedule would get crazy, and she has another administrative assistant that does that as well.

Besides that, I also am in charge of the information -- the Bureau of Information and Technology which has software developments as well as all of our databases and servers, all of that, approximately 50 state employees and 80 contractors.  I also have the Division of Research and Evaluation where we have around a dozen or so Ph.D. level social scientists who do all of our data and analytics and research into our programs and things of that nature.

And then finally, I have my Division of Policy which every policy that comes through I technically am the one who reviews it.  I will admit, though, however we have like 2,000 policies so I trust quite a few people, but I

do -- any major policy initiatives have to be cleared through my office first, and then I brief the director along with the assistant director and the chief of staff.

Q. Thank you.

And for the sake of background have you held any previous positions with ODRC?

A. Quite a few.

Q. And what would those be?

A. Okay. I'll just go back. So prior to the current position I was the chief of the Bureau of Classification and Reception, and prior to that position I was a -- I can't remember what they called them then because they changed, but I believe it was an operations manager for the Office of Prisons. Before that I was a deputy warden of operations in a prison. Before that I was deputy warden of special services. That was a temporary position, not a full -- well, not a permanent position. I was acting in that role. Before that I was the unit management chief. Prior to that I was an acting administrative assistant to a warden and acting labor relations officer. I was an investigator

full-time permanent prior to that. Before that I was a unit manager, and then before that I was a case manager.

Q. So certainly I would say extensive experience with ODRC. So to get to the real reason we're here, what do you know about ODRC's legal mail policy in general?

A. I know that we use a controlling number system. It's designed to basically prevent contraband from being introduced into the facilities by ensuring that our legal mail is routed -- is coming from a true legal mail source.

Q. So was legal mail a significant source of contraband into ODRC facilities?

A. Yes. Prior to the implementation we would experience approximately one incident on average a day of conveyance through legal mail.

Q. Okay. And now are there also other streams of contraband into the facilities as well?

A. Yes.

Q. Okay. Has there been -- since the institution of this policy, has there been a

significant reduction in contraband entering the prisons?

A. From legal mail or in general?

Q. In general.

A. Regrettably, there's no way to really assess how much contraband comes in because it's the dark figure. In other words, for me to answer that correctly, I would have to know how much gets by us undetected. What I can tell you is that the contraband coming through legal mail dropped precipitously to less than an average of about one a month. Excuse me, a little over one a month. Sorry. Let me correct that.

Q. Now, in the institution of this policy what kind of notice was given to inmates?

A. I do not have the specifics on that type of timeline. However, our policies -- this was an extensive process, and I do recall a 30-day notice at the minimum of a policy change before it became effective. However, the communications plan was not something that I handled personally.

Q. Okay. And were you personally involved in the implementation of this legal mail policy?

A. Implementation, no.

Q. Okay. And in the creation -- were you involved in the creation of this policy, the drafting, policymaking process?

A. I was an advisor to that, yes. I didn't write it.

Q. Okay. So are you familiar with Ohio Administrative Code Rule 5120-9-17?

A. Not by code number alone.

Q. Okay. That would be the Ohio Administrative Code provision for incoming mail. I have a copy I can introduce if you want to look at it.

A. I would appreciate that.

MR. YOUNG: Can I introduce this as an exhibit?

MR. SALEM: She has to mark it.

MR. YOUNG: Sorry. I need to have her mark it first.

And then, Jennifer, I have a copy for you as well.

-=O=-

(Deposition Exhibit 1 marked.)

-=O=-

BY MR. YOUNG:

Q.  Mr. Wittrup, I'll draw your attention to B(2).  Do you recognize that provision at all in relation to why we're here today?

A.  Yes.

Q.  Okay.  And then I'll -- I won't make you read it, but I'll read it for the sake of the record.  Administrative Code Rule 5120-9-17 Section B(2) states legal mail is mail addressed to an inmate clearly bearing the return address of an attorney at law, a public service law office, a law school legal clinic, court of law, or the correctional institution inspection committee that is marked with a valid control number provided by the department.  It may be opened and inspected for contraband only in the presence of the inmate addressee.  Legal mail does not include postcards from a court of law that indicates fees and/or fines owed by the inmate addressee.  If mail is received from any of the above-listed groups without a valid control number, then it may be treated as a regular, nonlegal mail as set forth in paragraph B(1) of this rule.

For the record, B(1) addresses just regular old mail from family members or something like that coming into the facility.

Mr. Wittrup, do the provisions of B(2) match your understanding of the contours of ODRC's legal mail policy?

A.  Yes.

Q.  Now, during the policymaking process, what was the intent of this policy or this Administrative Code rule?

A.  To reduce contraband.

Q.  And then what was considered in the drafting and implementation of this policy and the subsequent ODRC policies that reference this rule?

A.  Operational feasibility, impact on our community partners such as the groups listed herein.

Q.  Could you elaborate on the operational feasibility point?

A.  Yes.  The origin of this was from an executive leadership group.  We have executive leadership groups that are up and coming future leaders.  They come, they get problems, and we

ask them to solve them during a training program.  They had benchmarked with Pennsylvania who had a system like this, and they believed that Pennsylvania's system could simply be copied over into ours.

When it got to me, the operational feasibility, I knew that that couldn't happen.  And so I had to assemble the software development teams to create the system, and that was the operational feasibility.  If we made -- the design was to try to make it -- if you create way -- it's always a cost benefits analysis for lack of a better word.  You have to look at any type of policy.

Q.  So you stated that the operational group was looking to mirror the State of Pennsylvania's policy.  Is that correct?

A.  Yes.

Q.  And you've stated that that wasn't feasible as a copy?

A.  Because of code.  If I may clarify what you just said.  They wanted to use their software platform.  The idea is there.  Policy language, we really never would have considered

another state's policy language.  We might have reviewed it, but so many times the nuance of individual states is lost.  So really when it came down to -- that's why I called it operational feasibility -- was the code that Pennsylvania had just would not be transferable to us mostly because Pennsylvania didn't want it to be.  So we had to develop our own coding system, and I had my project manager in IT working on that to ensure that we didn't make -- we made a streamlined efficient system.

Q.  So your statement regarding operational feasibility is in relation to the software and the day-to-day operation of this rather than the legal aspect?

A.  Correct.

Q.  And then you mentioned the impact on community partners.  Would you be able to elaborate on that as well?

A.  Yes.  There was extensive outreach.  It wasn't done by myself.  It was done by individuals in the legal department.  I am sorry I can't remember who was the lead on that. Vinko Kucinic who was in the chief inspector's

office where we contacted various of the entities that are listed herein and explained the process and asked, you know, for their feedback, and you know, what can we do, and some of the software changes we made were based on the input that we received such as we created the ability to produce multiple numbers for batch jobs so they wouldn't have to keep on doing it again and again and again.

Q.  Now, were -- and I understand this may be a little bit out of your wheelhouse, but were there legal considerations in the drafting and implementation of this policy?

A.  All policy is reviewed by our legal counsel.

Q.  Mr. Wittrup, are you aware of Sallier versus Brooks out of Sixth Circuit?

A.  I've seen the name of the case, but I'm definitely not educated on it.

Q.  Do you know why the policy that the Sixth Circuit endorsed in Sallier was not considered by ODRC?

A.  The way the question is phrased I can't answer that because -- well, what I would say I

can't know if someone didn't consider it.

Q. Let me clarify. The Sixth Circuit essentially lays out that for legal mail to be opened if the prisoner requests to be present, they have to be present is the holding there.

Why would ODRC not take that tack?

MS. DRISCOLL: Objection.

MR. SALEM: I'm sorry, the grounds?

MS. DRISCOLL: You can answer. I'm just objecting for the record. You can answer if you can.

A. Oh. Well, I could only surmise. That would have been done by the legal department and their analysis.

Q. Thank you. And then in your role at ODRC are you aware of other litigation involving these same policies, similar issues?

A. I have been briefed on an issue with the federal courts. I don't have any, you know, detailed knowledge on that.

MR. SALEM: Off the record for one second.

(Discussion off the record.)

CROSS-EXAMINATION

BY MR. SALEM:

Q. Mr. Wittrup, just to add a little more clarity to the process, just in layman's terms why -- why is it considered impractical or impossible to open mail from courts in the presence of an inmate if the mailing does not have a control number?

A. Why is it not feasible?

Q. Yeah. I'm making the assumption that you think that it's operationally not feasible to have the inmate present to open mail in their presence when it comes purportedly from a court.

A. I don't concur with that summary of my position. We open mail -- we still open legal mail in the presence of an incarcerated person. We've been doing that -- no policy on that has changed. If it truly is legal mail, then we do still open it in the presence.

Q. So if an inmate gets a mailing from, let's say, the Court of Common Pleas General Division in Toledo, but it doesn't possess a control number, do you open a piece of mail like that in the presence of the inmate?

A.  No, not according to our policy.

Q.  Okay.  So it has to include a control number?

A.  Correct, except for the exception we have right now I believe with the federal courts.

Q.  Okay.  And that's the new policy that I guess we're going to be talking about that in a little bit, but there's a new policy that's being -- or the policy's being amended.  Is that correct?

A.  I don't know if the policy's being amended, but we are certainly making adjustments pending, you know, the final determination on advice of our counsel.

Q.  Okay.  And do you know -- I don't know if you've kept data on this, but how many -- what's the percentage of state courts that comply with the policy and actually obtain control numbers?

A.  I would have no data on that.  The last briefing I received I was told that most of them are using it when it's appropriate, but that would just be once again -- that report came

from Vinko Kucinic in the chief inspector's office.  It was a routine briefing.

Q.  Okay.  Is there a document?  Are you aware of any document that sort of outlines or includes that data?

A.  Once again, I do not believe there would be data on that, because if it's treated as regular mail and it doesn't have a control number, there's not specificity in any type of log.

Q.  Okay.  Is it fair to say that there's a significant number of mailings, however, coming from courts that do not possess control numbers?

A.  I would not be able to answer that.  Not because I refuse.  Because I don't have the data.

Q.  Okay.  Does the data to your knowledge exist somewhere?

A.  I would not think so unless someone has done something without my knowledge, because how are our reports for years -- although I acknowledge that I have not looked at a mail report for quite a while, but mail is divided into the -- the report is all regular mail is

put together in one number.  Okay.  And then legal mail would be another report that would be on there.  However, since this defines as legal mail they're not -- they're just going to count anything that doesn't have a control number or where they haven't received specific instruction to do otherwise as regular mail.  So it's going to be in a group of 9,000, shall we say, received correspondence, that sort of thing, but we don't break it down and say this many came from mom, this many came from dad, this many came from girlfriend, this many came from courts, this many came from, you know, these different sources.

Q.  So just -- I just want your personal opinion on, you know, how difficult it might be for the department to develop a policy that would allow for the opening of mail from courts in the presence of the inmate if it does not possess a control number.  Is that something that is possible?  Have you considered that?

A.  As stated previously, that was what we did for years.  So of course it's possible, yes.

Q.  Okay.  And the rationale you gave

previously I think is that this was intended to reduce the amount of contraband?

A. Yes. So for example, our correctional officers and mail room staff are not professional, you know -- first of all, when something's legal mail, you're not allowed to read it, right. So they don't even know. They can't even look at it. They just inspect it for contraband in general, right. So if -- all you'd have to do is write Common Pleas Court on a return address, and if you don't have a control number, you could just send that -- I could just do that at my home. I could look at a label that comes out and I can use a printer and do my own thing, and that's what happened. That was what was going on, was the person intending to smuggle the contraband to the person was saying, Bill Smith, Attorney At Law, you know, that's who this is from, or this is from this court or something like that. And the coding system was designed to ensure that it's legitimate.

The ODRC is in no way adverse to ensuring that legal mail is opened in front of

an incarcerated person and inspected in accordance with what we have seen as law and practice for years.

The key was, was attorneys and courts -- all the entities listed herein are not people who typically engage in contraband introduction. Sometimes it does happen, but when you don't have any controlling process over it, you basically -- you just can't like call up every attorney that sends something in or call the Common Pleas Court every time a mail -- hey, did you really send this to Bill Smith. That's what the control number is sort of -- in the simplest of terms it is a communication, say, hey, yeah, this is legit. We're -- you know, we're a legitimate source of this.

Q. So I'm curious if you have any numbers pre-policy of how many items of mail were purported to come from a court, not a lawyer, but from a court that were, in fact, fake, not from a court? Any idea of the numbers there?

A. I could not give specificity because the incident reporting system that we use does not -- it says -- the coding for it is legal

mail.  So prior to this coding system we would be able to say how many times did our staff detect contraband in legal mail.  It would not say legal mail from a court, legal mail from an attorney.

Q.  So we don't really know how often contraband was intended to be conveyed from -- in a mailing, that is, that was purported to be from a court.  We don't know how often or how prevalent it was?

A.  No.

Q.  Okay.  You mentioned a little while ago in your testimony that that did happen, that contraband did enter the facilities because of fake mail from courts.  So can you tell me more about why you believe that?

A.  Well, I was an investigator.  This is, of course, anecdotal at this point.  That was one of the things that they would do.  Somebody would get a letter from, I don't know, the Municipal Court or something like that, and they would steam open the envelope at their home, and then they would send it back in to us, and they would pack it up with like -- there was one I

remember very specifically that came from -- this is 25 years ago, but you know, it was a giant thing of stuff from -- I believe it was -- a federal court was the return address on it, and it was bound together so well that when our staff just flipped through it, which is all they're supposed to be doing, they didn't detect it, but this officer was pretty good and said that binding looks weird.  He opens it up and there was like a couple ounces of marijuana stuffed in that binding type of thing, but I mean, all I can say is legal mail as a general source listed as defined in our policy was a major source of contraband.

Q.  And again, I'll ask if there is any data to back up that claim that legal mail was a major source of contraband?

A.  Yeah.

Q.  Okay.  What is that data?  Where is that possessed?

A.  That's in our incident reporting system.

Q.  And then can we get --

A.  Sure.

Q.  -- some kind of summary of that data?

A.  Yeah.

MR. SALEM:  Jennifer, would you be able to supply that to us?

A.  We started that report in 2020 right during COVID, and we do have -- so we have a little bit of pre-data I'd be able to show.  And once again, what I quoted was the incident of legal mail was about once -- average of more than once a day, and now it's dropped down to an average of less than -- a little bit more than one a month.

Q.  And to your knowledge that can be attributed to the policy of legal mail -- on legal mail?

A.  Well, I mean, I can't think of any other extraneous variable that would have affected it during that time.  This was a pretty clear policy that was narrowly constructed to go after a particular issue.

Q.  One final question.

MR. SALEM:  And I apologize, John, for hijacking your deposition.

Q.  But has the department considered any ways to make it easier on courts to generate

control numbers so that those courts that are recalcitrant, that are hesitant to comply with this policy can have -- can basically have an easier system to work with?

A.   We absolutely did that.  During the development phase, as I mentioned earlier, one of the feedbacks we got from our community partners was, you know, the system is done, you got to do it, and you get one control number, and you get one control number.  So we created these batch control numbers where you could get a multitude of them.  I can't remember if it's 10 or 20, but it's the ability to generate a lot of numbers at once so that if you had a bunch of stuff that was going in you would just simply have to go in the computer once, get those numbers, put those on those 20 things and ship them out.  So it's a matter of we turned it into a -- reduced the amount of time they had to interact with the system by up to a significant amount.

Q.   And is that what courts are currently doing, is they're generating batch control numbers?

A. I can't tell you what the courts are doing. I can tell you that they have that capability.

Q. Has the department communicated that to individual courts?

A. To my knowledge, based on secondhand reports and briefings -- I never called a court, and I never did it, but yes, our outreach was -- from the legal department was definitely they were -- anybody who had concerns, they would reach out and see if they -- you know, how we could assist them with the system.

Q. Have you yourself received any comments or complaints or suggestions from court administrators or anybody else affiliated with courts about this policy?

A. Not me personally.

Q. Are you aware of any complaints?

A. From the federal courts I'm aware of that one because of the briefing I received.

Q. But you're not aware of any complaints from state courts?

A. No.

MR. SALEM: Okay. Thank you.

FURTHER CROSS-EXAMINATION

BY MR. YOUNG:

Q.  I promise this is kind of the tail end of our questioning.  Last thing we want to explore is this recent policy change.  Is that okay with you?

A.  Sure.

Q.  All right.  So it's my understanding from our discussion that there is a policy change of sorts coming regarding federal courts. Is that correct?

A.  Yes.

Q.  Could you just for the sake of the record explain that again?

A.  Well, regrettably, I would not be able to give much detail because I don't understand the nuance.  All I know is that we were advised by our legal department to shift the way we treat the federal court mail, and at that point that's as far as we've taken it.  We've put out a directive to say treat the mail this certain way.

Q.  So this directive only applies to mail from federal courts?

A. At this time to my knowledge, yes.

Q. So this directive does not apply to state courts?

A. To my knowledge, no, it does not.

Q. And this directive does not apply to agencies of any sort?

A. Would you please define what agencies those would be?

Q. Certainly. Our client has concern regarding law enforcement and things that might be sending mail that is legal in nature, and he does not want that inspected. So law enforcement entities.

A. To my knowledge, law enforcement entities have never been considered legal mail.

Q. So beyond just a directive to your facilities, is this change going to be officially implemented into ODRC policies or the Administrative Code?

A. That decision has not been made yet. I will add no one has come to me that a decision has been made.

Q. Is it correct that -- is it your testimony that state courts have been compliant

with the legal mail policy, the control number policy?

A.  In my last briefing I asked the specific question are we having any issues with state courts not using it, and I was told no.

Q.  Okay.  And is this policy directive regarding federal court mail -- it has been implemented at this stage, correct?

A.  Yes.

Q.  Okay.  So mail from federal courts without a control number is being treated as legal mail right now as of April 10th?

A.  What I can -- I always -- I'm not trying to be carving out.  I'm not a field operator. What I can tell you is directives have been given on that.  It is up to 28 separate prisons and their leadership to enforce those things and know whether or not they're being followed. There's just no way for me to know, you know, every day if policy is being adhered to, and that's true of any policy we have.  So I can only say from the department's position, you know, we are saying don't -- treat it as legal mail.

Q. Wonderful. We appreciate that. We understand, you know, where your position relates.

MR. YOUNG: Go off the record for just a brief moment.

(Recess taken.)

BY MR. YOUNG:

Q. Just a few last clarifications we want to make. In regard to this directive that has gone out, why did ODRC choose to not apply this directive to state courts?

A. The only thing we reserved -- the advice of our counsel was to do it for this particular reason. That's it.

Q. From ODRC's perspective, legal aside, now that mail is being sorted in this fashion to provide legal mail treatment to federal court mail, why not include state courts? Would that present challenges? Would that be impractical or would it be possible?

A. Contraband protection from conveyance is an extremely complex thing. We use drone detections, and body scanners, and chemical sniffers, and canines, and so many -- netting

around so people can't throw over fences. What I can tell you is any chink in armor is going to get contraband through. In every situation it's -- now, we don't have any data coming in yet so we're going to see. We're watching it, believe you me, we are. And we will use -- we always try to make data-informed decisions, but we have in action right now a system that data supports did reduce contraband from that chink in our armor, our contraband protection. And any further weakening of it would once again potentially open up -- I can't guarantee it. All I can tell you is that my experience if I've got drugs coming in through a truck from, you know, Aramark or somebody else or anybody, and we catch that, they're going to look for another one, and another one, and another one, and it's a game of -- not to use -- Whac-A-Mole. You never -- you can't -- you can't give up. You never have a solution. So besides that, you know, we're trying to maintain the strength of this defense as long as we can.

Q. So I just want to sum up to make sure we're on the same page here. So what you're

saying is if state courts were given the same treatment as federal courts are now under the new directive that could lead to additional contraband entering the facilities?

A.  It could.

Q.  And then in general are there any other possible changes to mail processing coming down the pike from ODRC?  Things like centralized mail processing, new directives, anything like that that could affect legal mail coming in?

A.  I'm not aware off the top of my head that I could attest to under oath.  We are doing a central mail processing system.  I know there has been talk about trying to go to a system where the courts can send things through the tablets, the GTL.  That's not policy.  It's not in development yet.  We've been asked by the public defender's office to do something where they can email basically it -- you know, it doesn't through our systems at all.  It goes straight to the incarcerated person through an electronic means.  All of those things we're interested in.  We -- you know, quite frankly for us if -- it's not the communication with the

courts or these community partners that is in any danger to us whatsoever. We don't want to hinder that communication. We really truly do not. It's the paper. It's the paper. It's all -- the new drugs today can be saturated in paper, and they're just not detectable at times, and so what we're doing with central mail processing is we're going to -- this is for regular mail to my knowledge only right now. We copy everything and they get an electronic version of that. And that's -- we don't want to hinder -- in fact, we are incredibly supportive of communication. We have one of the most liberal communication systems with friends and family and everybody else in the country. We give free phone calls and free emails. So we want to keep it. We want to do the minimum, you know, possible to hinder these sort of things. So that's the best way.

Probably a long answer to a relatively short question, but it's -- I think it's important to know that the goal was never -- we're not talking about we don't want to stop legal mail or communication. We want to make

sure it's legitimate, and if it's on paper, if it comes from a legitimate source, we're pretty much guaranteed or close to it that, you know, folks like yourself are not going to go to school and then blow it in order to spray some K2 on top of a piece of paper for somebody. It's just not going to happen.

Q.  I think speaking for everyone we appreciate long answers.  It helps us all be on the same page.  Not a problem at all.

I want to jump back a little bit to the creation process, the creation of the current legal mail policy.  You had mentioned that the working group, or operational group is how you referred to it, discussed Pennsylvania's policy. Is that correct?

A.  Correct.

Q.  Now, it is our understanding that Pennsylvania follows arguably one of the most restrictive legal mail policies comparatively. Were other states' policies considered such as Texas, California, states with larger prison populations that have taken a different tack than Pennsylvania?

Brian Wittrup
April 10, 2024

Page 38

A. I would have -- to answer that correctly, I would have to reread the executive team's report on it to see who they benchmarked with. They would have been told to benchmark with multiple entities before making their recommendation, but I don't know if they checked with those entities.

Q. Okay. So in general it is ODRC's practice to compare multiple different entities in the policy creation process?

A. Yes.

Q. Would the report of the different entities that were compared for this policy, would that be something that can be made available in this litigation?

A. I would have to know for sure whether or not there's any confidential information. I'd have to refer it over to our counsel to make sure there's not redactions, but it's an executive leadership report. There's one generated for each team every year. So that would have to be on record somewhere.

MR. YOUNG: Thank you. Probably be something we'll -- we'll talk to Jennifer on

that.

FURTHER CROSS-EXAMINATION

BY MR. SALEM:

Q.  Real quickly I'm just going to go back, and I promise we're done after this.  So now you're sorting mail from federal courts, and so you're actually in the sorting process now.  Is it -- in your opinion is it -- is it possible just to include state courts in that sorting process so that you're just sorting mail from federal and state courts?

A.  Everything's possible.

Q.  So it's possible.  Is there a specific reason why -- I know you mentioned on the advice of your lawyer, but so I'm not asking you to talk about any conversations with your attorneys, but to your knowledge what do you think the reason is that state courts are exempt from this new directive?

A.  If I may refer you back to the previous answer that I provided.  That is simply my -- I was asked for my opinion, and my opinion was is that the wider you make exceptions to a policy the more trucks can drive through it.

Q. So it sounds to me like it's almost an arbitrary decision because you could have just said in the directive state court mail will be viewed -- now does not need to include a control number but federal courts do. So why the distinction between federal and state courts?

A. That would once again fall back to advice of legal counsel and the desire to narrowly tailor the impact as much as possible.

Q. Okay. Do you have any idea how -- like what percentage of mail from courts is from federal courts versus state courts?

A. I'm sorry, I do not.

Q. Okay.

A. And I'm not aware of any numbers we would have on that.

MR. SALEM: Okay.

MR. YOUNG: Mr. Wittrup, thank you so much. That is all we have. Thank you all for being here.

COURT REPORTER: Read and sign?

MS. DRISCOLL: Yes, please.

COURT REPORTER: Are you ordering?

MR. SALEM: Not quite yet. We'll let

you know within a couple of days.  Thank you.

(Signature not waived.)

-=0=-

Thereupon, the testimony of April 10, 2024, was concluded at 11:04 a.m.

-=0=-

CERTIFICATE

STATE OF OHIO        :
                       SS:
COUNTY OF FRANKLIN :

I, Julia Lamb, RPR, CRR, a stenographic court reporter and notary public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named BRIAN WITTRUP was first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given was taken down by me stenographically in the presence of said witness, afterwards transcribed; that the foregoing is a true and correct transcript of the testimony; that this deposition was taken at the time and place in the foregoing caption specified.

I do further certify that I am not a relative, employee or attorney of any of the parties hereto; that I am not a relative or employee of any attorney or counsel employed by the parties hereto; that I am not financially interested in the action; and further, I am not, nor is the court reporting firm with which I am affiliated, under contract as defined in Civil Rule 28(D).

In witness whereof, I have hereunto set my hand at Columbus, Ohio, on this 24th day of April, 2024.


*Julia Lamb*

Julia Lamb, RPR, CRR
Notary Public, State of Ohio

My commission expires:  10-10-27

Brian Wittrup
April 10, 2024

## Exhibits

Exhibit 1  12:23

## -

-=0=-  12:22,24
-=O=-  41:3,6

## 1

1  12:23
10  28:13 41:4
10th  32:12
11:04  41:5

## 2

2,000  8:23
20  28:13,17
2019  7:17
2020  27:4
2024  41:5
25  26:2
28  32:16

## 3

30-day  11:18

## 5

50  8:14
5120-9-17  12:8 13:8

## 8

80  8:14

## 9

9,000  22:8

## A

a.m.  41:5
ability  6:15 17:7 28:13
above-listed  13:21
absolutely  28:5
accordance  24:2
acknowledge  21:22
acting  9:21,22,23
action  7:24 34:8
add  19:3 31:21
additional  35:3
address  13:10 23:11 26:4
addressed  13:9
addressee  13:17,20
addresses  14:1
adhered  32:20
adjustments  20:13
administrative  8:2,8 9:23 12:8,11 13:8 14:10 31:19
administrators  29:15
admit  8:23
adverse  23:23
advice  20:15 33:12 39:14 40:8
advised  30:17
advisor  7:22 12:5
affect  35:10
affected  27:16
affiliated  29:15
agencies  31:6,7
agency  7:23
allowed  23:6
amended  20:10,13
amount  23:2 28:19,21
analysis  15:13 18:14

analytics  8:18
and/or  13:19
Anderson  5:12
anecdotal  25:18
answers  6:4 37:9
apologize  27:21
applies  30:23
apply  31:2,5 33:10
approximately  8:14 10:17
April  32:12 41:4
Aramark  34:15
arbitrary  40:2
arguably  37:19
armor  34:2,10
aspect  16:15
assemble  15:8
assess  11:6
assist  29:12
assistant  8:8 9:3,23
assumption  19:10
attention  13:2
attest  35:12
attorney  13:11 23:18 24:10 25:5
attorneys  24:4 39:17
attributed  27:13
average  10:18 11:11 27:8,10
aware  7:9 17:16 18:16 21:4 29:18,19,21 35:11 40:15

## B

B(1)  13:24 14:1
B(2)  13:3,9 14:4
back  9:10 25:23 26:16 37:11 39:4,20 40:7
background  9:6

based  17:5 29:6
basically  10:9 24:9 28:3 35:19
batch  17:8 28:11,23
bearing  13:10
behalf  8:4
believed  15:3
benchmark  38:4
benchmarked  15:2 38:3
benefits  15:12
Bill  23:18 24:12
binding  26:9,11
bit  7:9 17:11 20:9 27:6,10 37:11
blocker  8:6
blow  37:5
body  33:23
bound  26:5
break  6:23 7:2 22:10
BRIAN  5:1
briefed  18:18
briefing  20:22 21:2 29:20 32:3
briefings  29:7
Brooks  17:17
bunch  28:14
Bureau  8:11 9:12

## C

California  37:22
call  24:9,10
called  9:14 16:4 29:7
calls  36:16
canines  33:24
capability  29:3
care  8:5
carving  32:14

Brian Wittrup
April 10, 2024

case 10:3 17:18

catch 5:15 34:16

central 35:13 36:7

centralized 35:8

certified 5:2

challenges 33:19

change 11:19 30:5,10 31:17

changed 9:15 19:18

charge 8:10

checked 38:6

chemical 33:23

chief 7:14 9:4,11,22 16:24 21:1

chink 34:2,9

choose 33:10

Circuit 17:17,21 18:2

claim 26:16

clarifications 33:8

clarify 15:21 18:2

clarity 19:4

Classification 9:12

clear 7:6 27:17

cleared 9:2

client 31:9

clinic 5:10 13:12

close 37:3

code 12:8,9,11 13:8 14:10 15:21 16:5 31:19

coding 16:8 23:21 24:24 25:1

colleagues 5:12

College 5:9

comments 29:13

committee 13:14

Common 19:21 23:10 24:11

communicated 29:4

communication 24:14 35:24 36:3,13, 14,24

communications 11:21

community 14:17 16:18 28:7 36:1

comparatively 37:20

compare 38:9

compared 38:13

complaints 29:14,18, 21

complex 33:22

compliant 31:24

comply 20:19 28:2

complying 8:1

computer 28:16

concern 31:9

concerns 29:10

concluded 41:5

concur 19:14

confidential 38:17

considerations 17:12

considered 14:12 15:24 17:22 19:5 22:21 27:23 31:15 37:21

constructed 27:18

contacted 17:1

contours 14:5

contraband 10:10,15, 20 11:1,6,10 13:16 14:11 23:2,9,17 24:6 25:3,7,14 26:14,17 33:21 34:3,9,10 35:4

contractors 8:15

control 13:14,22 19:8, 23 20:2,20 21:8,13 22:5,20 23:12 24:13 28:1,9,10,11,23 32:1, 11 40:4

controlling 10:8 24:8

conversations 39:16

conveyance 10:18 33:21

conveyed 25:7

copied 15:5

copy 12:12,20 15:20 36:10

correct 6:13 11:13 15:17 16:16 20:4,11 30:11 31:23 32:8 37:16,17

Correction 7:8

correctional 13:13 23:3

correctly 11:8 38:2

correspondence 8:4 22:9

cost 15:12

counsel 17:15 20:15 33:13 38:18 40:8

count 22:4

country 36:15

couple 26:10 41:1

court 13:12,18 19:13, 21 23:10,20 24:11,19, 20,21 25:4,9,21 26:4 29:7,14 30:19 32:7 33:17 40:3,21,23

courts 18:19 19:6 20:6,18 21:13 22:13, 18 24:4 25:15 27:24 28:1,22 29:1,5,16,19, 22 30:10,24 31:3,24 32:5,10 33:11,18 35:1, 2,15 36:1 39:6,9,11,18 40:5,6,11,12

COVID 27:5

crazy 8:7

create 15:9,12

created 17:6 28:10

creation 12:2,3 37:12 38:10

controlling 10:8 24:8

CROSS-EXAMINATION 5:4 19:1 30:1 39:2

curious 24:17

current 6:14 9:11 37:12

**D**

dad 22:11

danger 36:2

dark 11:7

data 8:18 20:17,21 21:5,7,16,17 26:15,19, 24 34:4,8

data-informed 34:7

databases 8:13

day 10:18 27:9 32:20

day-to-day 16:14

days 41:1

December 7:17

decision 31:20,21 40:2

decisions 34:7

defender's 35:18

defense 34:22

define 31:7

defined 26:13

defines 22:3

department 7:7 13:15 16:22 18:13 22:17 27:23 29:4,9 30:18

department's 32:22

deposed 5:16

deposes 5:3

deposition 12:23 27:22

deputy 9:17,18

design 15:11

designed 10:9 23:21

desire 40:8

Brian Wittrup
April 10, 2024

detail 30:16

detailed 18:20

detect 25:3 26:7

detectable 36:6

detections 33:23

determination 20:14

develop 16:8 22:17

development 15:9 28:6 35:17

developments 8:12

difficult 22:16

directive 30:21,23 31:2,5,16 32:6 33:9,11 35:3 39:19 40:3

directives 32:15 35:9

directly 7:21

director 7:21 8:3 9:3,4

discussed 37:15

discussion 18:23 30:9

distinction 40:6

divided 21:23

Division 8:15,20 19:22

divisions 7:23

document 21:3,4

dozen 8:17

drafting 12:4 14:13 17:12

draw 13:2

DRISCOLL 18:7,9 40:22

drive 39:24

drone 33:22

dropped 11:11 27:9

drugs 34:14 36:5

duly 5:2

duties 7:18

**E**

earlier 28:6

easier 27:24 28:4

educated 17:19

effective 11:20

efficient 16:11

elaborate 14:19 16:19

electronic 35:22 36:10

email 35:19

emails 8:3 36:16

employees 8:14

end 30:3

endorsed 17:21

enforce 32:17

enforcement 31:10, 13,14

engage 24:6

ensure 16:10 23:21

ensuring 10:11 23:24

enter 25:14

entering 11:1 35:4

entire 7:23

entities 17:2 24:5 31:13,15 38:5,7,9,13

envelope 25:22

essentially 18:3

Evaluation 8:16

Everything's 39:12

exception 20:4

exceptions 39:23

Excuse 11:12

executive 14:22 38:2, 20

exempt 39:18

exhibit 12:16,23

exist 21:18

experience 10:5,17 34:13

explain 30:14

explained 17:2

explore 30:5

extensive 10:4 11:18 16:20

extraneous 27:16

extremely 33:22

**F**

facilities 10:11,15,20 25:14 31:17 35:4

facility 14:3

fact 24:20 36:12

fair 21:11

fake 24:20 25:15

fall 40:7

familiar 12:7

family 14:2 36:15

fashion 33:16

feasibility 14:16,20 15:7,10 16:5,13

feasible 15:20 19:9,11

federal 18:19 20:5 26:4 29:19 30:10,19, 24 32:7,10 33:17 35:2 39:6,11 40:5,6,12

feedback 17:4

feedbacks 28:7

feel 6:8

fees 13:19

fences 34:1

field 32:14

figure 11:7

final 20:14 27:20

finally 8:20

fines 13:19

finished 6:20

flipped 26:6

folks 37:4

follow 8:1

frankly 35:23

free 6:8 36:16

friends 36:14

front 23:24

full 9:20

full-time 10:1

functions 8:2

future 14:23

**G**

game 34:18

gave 22:24

general 10:7 11:3,4 19:21 23:9 26:12 35:6 38:8

generate 27:24 28:13

generated 38:21

generating 28:23

giant 26:3

girlfriend 22:12

give 24:22 30:16 34:19 36:16

goal 36:22

good 5:6,7 26:8

ground 5:20

grounds 18:8

group 14:22 15:15 22:8 37:14

groups 13:21 14:17, 23

GTL 35:16

guarantee 34:12

guaranteed 37:3

guess 20:8

Brian Wittrup
April 10, 2024

## H

handle 7:22 8:2

handled 11:22

happen 15:7 24:7 25:13 37:7

happened 23:15

head 6:2 35:11

hear 6:6,7

held 9:7

helps 37:9

hereinafter 5:2

hesitant 28:2

hey 24:11,14

hijacking 27:22

hinder 36:3,12,18

holding 18:5

home 23:13 25:22

## I

idea 15:23 24:21 40:10

impact 14:16 16:17 40:9

implementation 10:16 11:24 12:1 14:13 17:13

implemented 31:18 32:8

important 36:22

impossible 19:6

impractical 19:5 33:19

incarcerated 19:16 24:1 35:21

incident 10:17 24:23 26:21 27:7

include 13:18 20:2 33:18 39:9 40:4

includes 21:5

including 5:17

incoming 12:11

incredibly 36:12

individual 16:3 29:5

individuals 16:22

information 8:11 38:17

initiatives 9:1

inmate 13:10,17,20 19:7,12,20,24 22:19

inmates 11:15

input 17:6

inspect 23:8

inspected 13:16 24:1 31:12

inspection 13:13

inspector's 16:24 21:1

institution 10:24 11:14 13:13

instruction 22:6

intended 23:1 25:7

intending 23:17

intent 14:9

interact 28:20

interested 35:23

introduce 12:12,15

introduced 10:10

introduction 24:6

investigator 9:24 25:17

involved 11:23 12:3

involving 18:16

issue 18:18 27:19

issues 18:17 32:4

items 24:18

## J

Jennifer 12:20 27:2

38:24

job 7:18

jobs 17:8

John 5:8 27:21

Julia's 6:18

jump 5:14 37:11

## K

K2 37:6

key 24:4

kind 5:20 11:15 26:24 30:3

knew 15:7

knowledge 18:20 21:17,20 27:12 29:6 31:1,4,14 36:9 39:17

Kucinic 16:24 21:1

## L

label 23:14

labor 9:24

lack 15:13

language 15:24 16:1

larger 37:22

law 5:8,9 13:11,12,18 23:18 24:2 31:10,12, 14

lawyer 24:19 39:15

laying 5:20

layman's 19:4

lays 18:3

lead 16:23 35:3

leaders 14:24

leadership 14:22,23 32:17 38:20

legal 5:10 10:7,11,12, 14,18 11:3,10,24 13:9, 12,17 14:6 16:15,22 17:12,14 18:3,13 19:15,18 22:2,3 23:6,

24 24:24 25:3,4 26:12, 16 27:8,13,14 29:9 30:18 31:11,15 32:1, 12,23 33:15,17 35:10 36:24 37:13,20 40:8

legally 5:22

legit 24:15

legitimate 23:22 24:16 37:1,2

letter 25:20

level 8:17

liberal 36:14

listed 14:17 17:2 24:5 26:13

litigation 18:16 38:15

log 21:10

long 7:15 34:22 36:20 37:9

looked 21:22

lost 16:3

lot 8:3 28:13

## M

made 15:10 16:11 17:5 31:20,22 38:14

mail 10:7,11,12,14,18 11:3,10,24 12:11 13:9, 17,20,23 14:2,6 18:3 19:6,12,15,16,18,23 21:8,22,23,24 22:2,4, 7,18 23:4,6,24 24:11, 18 25:1,3,4,15 26:12, 16 27:8,13,14 30:19, 21,23 31:11,15 32:1,7, 10,12,24 33:16,17,18 35:7,9,10,13 36:7,9,24 37:13,20 39:6,10 40:3, 11

mailing 19:7,20 25:8

mailings 21:12

maintain 34:21

major 9:1 26:14,17

make 8:1,4 13:6 15:11 16:10 27:24 33:9 34:7,

Brian Wittrup
April 10, 2024

23 36:24 38:18 39:23

making 19:10 20:13 38:5

management 9:22

manager 9:16 10:2,3 16:9

marijuana 26:10

mark 12:17,19

marked 12:23 13:14

match 14:5

matter 28:18

means 35:22

Megan 5:12

members 14:2

mentioned 16:17 25:12 28:6 37:13 39:14

middle 7:1

minimum 11:19 36:17

mirror 15:16

mom 22:11

moment 33:5

month 11:12,13 27:11

morning 5:6,7

mouthful 7:9

multiple 17:7 38:5,9

multitude 28:12

Municipal 25:21

**N**

name's 5:8

narrowly 27:18 40:9

nature 8:19 31:11

netting 33:24

noise 6:3

nonlegal 13:23

notice 11:15,19

nuance 16:2 30:17

number 10:8 12:9 13:15,22 19:8,23 20:3 21:9,12 22:1,5,20 23:12 24:13 28:9,10 32:1,11 40:5

numbers 17:7 20:20 21:13 24:17,21 28:1, 11,14,17,24 40:15

**O**

oath 5:22 35:12

objecting 18:10

Objection 18:7

obligated 5:23

obtain 20:19

ODRC 7:7,13 9:7 10:5, 15 14:14 17:22 18:6, 16 23:23 31:18 33:10 35:8

ODRC's 10:6 14:6 33:15 38:8

office 9:2,16 13:12 17:1 21:2 35:18

officer 9:24 26:8

officers 23:4

officially 31:18

Ohio 7:7 12:7,10

open 19:6,12,15,19,23 25:22 34:12

opened 13:16 18:4 23:24

opening 22:18

opens 26:9

operation 16:14

operational 14:16,19 15:6,10,15 16:5,12 37:14

operationally 19:11

operations 9:15,17

operator 32:14

opinion 22:16 39:8,22

order 37:5

ordering 40:23

origin 14:21

ounces 26:10

outlines 21:4

outreach 16:20 29:8

owed 13:19

**P**

pack 25:24

paper 36:4,6 37:1,6

paragraph 13:23

partners 14:17 16:18 28:8 36:1

past 6:14

pending 20:14

Pennsylvania 15:2 16:6,7 37:19,24

Pennsylvania's 15:4, 17 37:15

people 8:5,24 24:5 34:1

percentage 20:18 40:11

permanent 9:20 10:1

person 19:16 23:16, 18 24:1 35:21

personal 22:15

personally 11:22,23 29:17

perspective 33:15

Ph.d. 8:17

phase 28:6

phone 36:16

phrased 17:23

piece 19:23 37:6

pike 35:8

place 7:7

plan 7:22,24 11:21

platform 15:23

Pleas 19:21 23:10 24:11

point 6:12,24 14:20 25:18 30:19

policies 8:24 11:17 14:14 18:17 31:18 37:20,21

policy 7:14,21 8:21 9:1 10:7,24 11:14,19, 24 12:3 14:6,9,13 15:14,17,23 16:1 17:13,14,20 19:17 20:1,7,9,19 22:17 26:13 27:13,18 28:3 29:16 30:5,9 32:1,2,6, 20,21 35:16 37:13,15 38:10,13 39:23

policy's 20:10,12

policymaking 12:4 14:8

populations 37:23

position 7:13,16,19 9:11,13,19,20 19:15 32:22 33:2

positions 9:7

possess 19:22 21:13 22:20

possessed 26:20

postcards 13:18

potentially 34:12

practice 24:3 38:9

pre-data 27:6

pre-policy 24:18

precipitously 11:11

presence 13:17 19:7, 13,16,19,24 22:19

present 18:4,5 19:12 33:19

pretty 26:8 27:17 37:2

prevalent 25:10

prevent 10:9

previous 9:7 39:20

previously 22:22 23:1

Brian Wittrup
April 10, 2024

primarily 5:13 7:20

printer 23:14

prior 9:10,13,22 10:1,
16 25:1

prison 9:17 37:22

prisoner 18:4

prisons 9:16 11:2
32:16

problem 37:10

problems 14:24

process 11:18 12:4
14:8 17:3 19:4 24:8
37:12 38:10 39:7,10

processing 35:7,9,13
36:8

produce 17:7

professional 23:5

professor 5:11

program 15:2

programs 8:19

project 16:9

promise 30:3 39:5

protection 33:21
34:10

provide 6:1 7:24
33:17

provided 13:15 39:21

provision 12:11 13:3

provisions 14:4

public 13:11 35:18

purported 24:19 25:8

purportedly 19:13

put 22:1 28:17 30:20

**Q**

question 6:6,7,9,13,
14,15,19,20 7:1 17:23
27:20 32:4 36:21

questioning 30:4

questions 6:2

quickly 39:4

quoted 27:7

**R**

rationale 22:24

reach 29:11

read 13:7 23:7 40:21

real 10:5 39:4

reason 10:6 33:14
39:14,18

recalcitrant 28:2

recall 11:18

received 13:20 17:6
20:22 22:6,9 29:13,20

recent 30:5

Reception 9:12

recess 33:6

recognize 13:3

recommendation
38:6

record 7:6 13:8 14:1
18:10,21,23 30:14
33:4 38:22

redactions 38:19

reduce 14:11 23:2
34:9

reduced 28:19

reduction 11:1

refer 38:18 39:20

reference 14:14

referred 37:15

refuse 21:15

regard 33:9

regrettably 11:5
30:15

regular 13:23 14:2
21:8,24 22:7 36:9

Rehabilitation 7:8

relates 33:3

relation 13:4 16:13

relations 9:24

remember 9:14 16:23
26:1 28:12

repeat 6:8

rephrase 6:9

report 20:24 21:23,24
22:2 27:4 38:3,12,20

REPORTER 40:21,23

reporting 24:23 26:21

reports 21:21 29:7

requests 18:4

reread 38:2

research 8:16,18

reserved 33:12

respond 8:4

responses 6:2,3

restrictive 37:20

return 13:10 23:11
26:4

reviewed 16:2 17:14

reviews 8:22

Rob 5:14,18

Robert 5:11

role 5:17 9:21 18:15

room 23:4

routed 10:12

routine 21:2

rule 12:8 13:8,24
14:10,15

rules 5:21

**S**

sake 6:18 7:5 9:6 13:7
30:13

Salem 5:11 12:17
18:8,21 19:2 27:2,21
29:24 39:3 40:17,24

Sallier 17:16,21

sanity 6:19

saturated 36:5

scanners 33:23

schedule 8:7

scheduling 8:6

school 13:12 37:5

scientists 8:17

secondhand 29:6

Section 13:9

send 23:12 24:12
25:23 35:15

sending 31:11

sends 24:10

separate 32:16

servers 8:13

service 13:11

services 9:19

set 13:23

shaking 6:2

shift 30:18

ship 28:17

short 36:21

show 27:6

sign 40:21

signature 41:2

significant 10:14 11:1
21:12 28:20

similar 18:17

simplest 24:13

simply 15:4 28:15
39:21

situation 34:3

Sixth 17:17,21 18:2

Smith 23:18 24:12

smuggle 23:17

sniffers 33:24

social 8:17

software 8:12 15:8,23

16:13 17:5

solution 34:20

solve 15:1

something's 23:6

sort 6:3 8:6 21:4 22:9 24:13 31:6 36:18

sorted 33:16

sorting 39:6,7,9,10

sorts 30:10

sounds 40:1

source 10:13,14 24:16 26:13,14,17 37:2

sources 22:14

speaking 37:8

special 9:18

specific 22:6 32:3 39:13

specifically 26:1

specificity 21:9 24:22

specifics 11:16

spray 37:5

staff 9:4 23:4 25:2 26:6

stage 32:8

start 6:19

started 27:4

state 8:14 15:16 20:18 29:22 31:3,24 32:4 33:11,18 35:1 39:9,11, 18 40:3,6,12

state's 16:1

stated 15:15,19 22:22

statement 16:12

states 13:9 16:3 37:22

states' 37:21

steam 25:22

stop 36:23

straight 35:21

strategic 7:22

strategy 7:14,22

streamlined 16:11

streams 10:20

strength 34:21

student 5:8

stuff 26:3 28:15

stuffed 26:11

subsequent 14:14

suggestions 29:14

sum 34:23

summary 19:14 26:24

supervisor 5:11

supply 27:3

supportive 36:12

supports 34:9

supposed 26:7

surmise 18:12

sworn 5:2

system 10:9 15:3,4,9 16:9,11 23:21 24:23 25:1 26:21 28:4,8,20 29:12 34:8 35:13,14

systems 35:20 36:14

**T**

tablets 35:16

tack 18:6 37:23

tail 30:3

tailor 40:9

talk 35:14 38:24 39:16

talking 5:13 20:8 36:23

team 38:21

team's 38:3

teams 15:9

technically 8:22

Technology 8:12

temporary 9:19

terms 19:4 24:14

testifying 5:21

testimony 25:13 31:24 41:4

Texas 37:22

thing 22:9 23:15 26:3, 11 30:4 33:12,22

things 8:19 25:19 28:17 31:10 32:17 35:8,15,22 36:18

throw 34:1

time 24:11 27:17 28:19 31:1

timeline 11:17

times 5:17 16:2 25:2 36:6

today 5:22 13:4 36:5

told 20:22 32:5 38:4

Toledo 5:9,10 19:22

top 35:11 37:6

training 15:1

transferable 16:6

treat 30:19,21 32:23

treated 13:22 21:7 32:11

treatment 33:17 35:2

truck 34:14

trucks 39:24

true 10:12 32:21

trust 8:24

truth 5:23

turned 28:18

type 11:16 15:14 21:9 26:11

typically 24:6

**U**

Uh-huh 5:19

unable 6:7

understand 5:16,21 6:1,4,7,10,16,21 7:3 17:10 30:16 33:2

understanding 14:5 30:8 37:18

undetected 11:9

unit 9:21 10:2

University 5:9,10

**V**

valid 13:14,21

variable 27:16

verbal 6:1

version 36:11

versus 17:17 40:12

viewed 40:4

Vinko 16:24 21:1

**W**

waived 41:2

wanted 7:6 15:22

warden 9:17,18,23

watching 34:5

ways 27:24

weakening 34:11

weird 26:9

Whac-a-mole 34:18

whatsoever 36:2

wheelhouse 17:11

wider 39:23

Wittrup 5:1,6 7:12 13:2 14:4 17:16 19:3 40:18

Wonderful 7:5 33:1

word 15:13

words 11:7

work 7:20 28:4

**working**  16:10 37:14

**write**  12:6 23:10

---

**Y**

---

**year**  38:21

**years**  21:21 22:23
24:3 26:2

**yes-or-no**  6:3

**Young**  5:5,8 12:15,18
13:1 30:2 33:4,7 38:23
40:18



390 S. Washington Avenue
Columbus, Ohio 43215

**614.460.5000**

www.priohio.com
pri@priohio.com

# SIGNATURE ADDENDUM

Case Caption:  **Jeremy J. Quinn, Jr. vs. John/Jane Doe, et al. [3:22-cv-661 ]**
Deposition of:  **Brian Wittrup**
Date Taken:  **04/10/2024**
File Number:  **327938**

Dear Counsel:

As of **6/3/2024**, PRI Court Reporting, LLC does hereby certify that:  **Brian Wittrup** did not return an errata sheet for their deposition taken 04/10/2024.  The deponent was notified by letter and/or e-mail about the review process and informed of Rule 30, providing the number of days within which to read and sign the deposition. The witness has not notified our office of their waiver or of illness or absence of the witness, or the refusal to sign.  Therefore, the deposition may be used as fully as though signed.

Sincerely,

*Angie Starbuck*

**Angie Starbuck**
**PRI Court Reporting, LLC**