IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| JEREMY J. QUINN, JR., <br><br> Plaintiff, <br><br> vs. <br><br> ANDREW RODRIGUEZ, *et al*., <br><br> Defendants. | CASE NO. 3:22-CV-00661-DAC <br><br> MAGISTRATE JUDGE DARRELL A. CLAY <br><br> **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** <br> [ECF #43, 44] |

**PROCEDURAL BACKGROUND**

This action challenges the Ohio Department of Rehabilitation and Correction's (ODRC) new policy on inmate legal mail (the Policy). Plaintiff Jeremy Quinn, Jr. is an inmate at the Northeast Ohio Correctional Center, a prison in Youngstown, Ohio that ODRC administers. Mr. Quinn asserts the Policy is unconstitutional and seeks relief under 42 U.S.C. § 1983. Originally named as Defendants in their individual and official capacities were John/Jane Doe (mail room supervisor and corrections officer), John/Jane Doe (Main Central Office of ODRC administrative staff who created and enforced the Legal Mail Policy (75-MAL-01)), and (because Mr. Quinn was previously incarcerated there) Toledo Correctional Institution (ToCI) Warden Harold May. (ECF #1).

With the Complaint, Mr. Quinn moved for a temporary restraining order and preliminary injunction barring the Policy's enforcement. (ECF #3). Warden May moved to dismiss the Complaint for failure to state a claim. (ECF #8). On Mr. Quinn's motion (ECF #6), then-presiding

1

District Judge Jeffrey Helmick appointed counsel to represent him and ordered supplemental briefing on the motion to dismiss. (ECF #18, 20). In addition, Judge Helmick denied without prejudice Mr. Quinn's motions for injunctive relief. (ECF #18). Judge Helmick then granted Mr. Quinn's motion to amend the Complaint to substitute Andrew Rodriguez in place of John/Jane Doe (mailroom supervisor and corrections officer) and granted in part and denied in part Defendant's motion to dismiss, dismissing claims under the Fifth, Sixth, and Fourteenth Amendments and all claims against Defendants in their official capacities. (ECF #24). Judge Helmick allowed the First Amendment claim to proceed and concluded Defendants were not entitled to qualified immunity. (*Id.*). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) (ECF #26), and I subsequently granted Mr. Quinn's motion to add Annette Chambers-Smith, ODRC's Director, as a defendant in her official and individual capacities. (ECF #33).

As to his remaining constitutional claim, Mr. Quinn alleges the Policy violates his First Amendment rights. (ECF #1). He seeks a declaration that Defendants violated his constitutional rights; compensatory, nominal, and punitive damages; and injunctive relief to "stop the illegal action of 'reading, copying, and opening of legal documents'" sent from courts, state and federal agencies, and lawyers and law firms. (ECF #1 at PageID 9).

The parties have cross-moved for summary judgment. (ECF #43, 44, 45, 46, 48). As I explain below, I **DENY** Mr. Quinn's motion for summary judgment on his remaining First Amendment claim. I **GRANT IN PART** Defendants' cross-motion for summary judgment on the First Amendment claim but **DENY** summary judgment as it relates to Defendants' claim of

2

qualified immunity. I also **GRANT** summary judgment for Defendant Annette Chambers-Smith in her official capacity.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party shows there is insufficient evidence to support any element of the nonmoving party's claim and moves for summary judgment, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Evidence is viewed in the light most favorable to the nonmoving party, meaning "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004). Ultimately, the pertinent inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## FACTUAL BACKGROUND

I begin by reviewing ODRC's old and new policies relating to inmate legal mail. Before the change, the Ohio Administrative Code defined "legal mail" as "mail addressed to an inmate clearly bearing the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the Correctional Institution Inspection Committee." Ohio Admin. Code § 5120-9-17(B)(2) (effective through April 7, 2022). Legal mail received at an ODRC institution was logged, opened (but not read) in the inmate's presence, and visually inspected for obvious signs of contraband. (Buchanan Aff., ECF #44-6 at PageID 295). In contrast, regular mail was processed outside the inmate's presence and not logged. (*Id.*). Regular mail was opened under a ventless hood system to prevent exposure to potentially hazardous substances and visually inspected for contraband, the contents were read for potential security threats, and inmates received copies of the contents instead of the original documents. (*Id.*).

According to ODRC's Intelligence Chief Vinko Kucinic, under the old policy "sending contraband through legal mail was not difficult because the procedure to qualify an envelope or a package as legal mail was general," requiring only a return address and a stamp identifying it as legal mail. (Kucinic Aff., ECF #44-1 at PageID 269). ODRC averaged about 700 drug-contraband-related incidents per month, including discovery of contraband contained in fake legal mail. (*Id.* at PageID 270). For instance, in November 2020, an ODRC institution seized fake legal mail with a return address of the Franklin County Clerk of Courts. (*Id.*). In December 2020, another ODRC institution seized 20 strips of Suboxone that had been conveyed through legal mail, with a return address of the Cuyahoga County Clerk of Courts. (*Id.*). ODRC also intercepted fake legal mail

4

with return addresses from the Office of the Ohio Public Defender and the Ohio Innocence Project. (*Id.*).

On top of how readily a third party could introduce contraband disguised as legal mail into a prison simply by affixing a court or law firm's return address to the envelope, newer and more sophisticated methods of conveying drugs without detection into Ohio's prisons have involved legal mail. (ECF #44-6 at PageID 296). One such method involves placing drug-saturated letters, documents, cards, photographs, artwork, or legal documents into envelopes disguised as legitimate regular and legal mail. (ECF #44-1 at PageID 270; ECF #44-6 at PageID 294). Chillicothe Correctional Institution even intercepted a letter describing how to create illegitimate legal mail packages laced with synthetic marijuana. (ECF #44-1 at PageID 270). Before her arrest in March 2022, one woman sent at least 34 drug-soaked packages to ODRC institutions disguised as legal mail. (*Id.*).

In October 2021, inmates at ToCI were notified of a change to ODRC's legal-mail policy intended to combat the conveyance of contraband into the facility via legal mail. (*See* ECF #44-6 at PageID 296). Under new Policy No. 75-MAL-03, effective October 4, 2021, legal entities must register with ODRC and affix a unique control number to the envelope of each piece of legal mail sent to an inmate for ODRC to process it as legal mail. (*Id.* at PageID 296). Similar to the old policy, legal mail is logged and can be opened and inspected for contraband only in the inmate's presence. (*Id.*). But the similarity ends there. Mail not containing a valid control number is "automatically treated as regular mail, regardless of the return address on the envelope." (*Id.* at PageID 297). In 2022, the definition of "legal mail" in the Ohio Administrative Code was revised to be consistent with the Policy:

5

> "Legal mail" is mail addressed to an inmate clearly bearing the return address of an attorney-at-law, a public service law office, a law school legal clinic, court of law, or the correctional institution inspection committee that is marked with a valid control number provided by the department. It may be opened and inspected for contraband only in the presence of the inmate-addressee. "Legal mail" does not include postcards from a court of law that indicates fees and/or fines owed by the inmate-addressee. If mail is received from any of the groups listed without a valid control number, then it may be treated as a regular, non-legal mail.

Ohio Admin. Code § 5120-9-17(B)(2) (effective April 8, 2022). In sum, ingenuity in the conveyance of contraband into prison facilities prompted ODRC to recharacterize what appears to be legitimate legal mail as regular mail for the want of an administrative control number. (ECF #44-6 at PageID 296-97).

Since implementing the policy, ODRC asserts that contraband intercepted through legal mail dropped sharply. (ECF #44-1 at PageID 272). In 2020, ODRC intercepted contraband disguised as legal mail 370 times. (*Id.* at PageID 272). In 2021, where the new policy became effective in October, ODRC intercepted contraband from legal mail 228 times. (*Id.*). In 2022, there were 22 incidents, and in 2023, just 9 incidents. (*Id.*).

Mr. Quinn alleges prison staff opened and read his legal mail from the Supreme Court of Ohio and the federal court, both of which pertained to his "criminal case and conviction," and gave him copies instead of the original documents. (ECF #1 at PageID 3-4). Attached to the Complaint are logs of email communication between Mr. Quinn and ODRC staff where Mr. Quinn asserted the Policy violates the Supreme Court's holding in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and the Sixth Circuit's holding in *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003). (ECF #1-4 at PageID 22; ECF #1-5 at PageID 23; ECF #1-6 at PageID 24; ECF #1-7 at PageID 25; ECF #1-8 at PageID 26). Mr. Rodriguez, the mailroom supervisor, responded as follows:

6

> Mail from all the state and federal courts and their clerk's offices will be presumed to be regular mail and should be processed as such. That means the envelope will be opened, the contents examined and copied, and then the copied contents will be given to the incarcerated recipient.
>
> * * *
>
> The pin number you['re] referencing is related to legal mail from an Attorney, not State and Federal courts, and yes it is required to have a control number but it will not be opened without you being present unless it[']s incorrectly labeled.

(ECF #1-4 at PageID 22; ECF #1-6 at PageID 24). When Mr. Quinn escalated his complaint under ToCI's grievance procedures, investigator Michael Jenkins reiterated the policy, denied the grievance because there was no violation of policy, procedure, or law, and provided that "[m]ail that comes from a court should be treated like regular mail, not legal mail. If the court is sending confidential mail to an incarcerated person, it will mark the mail as 'Confidential' or use a control number." (ECF #1-6 at PageID 24; ECF #1-7 at PageID 25). Mr. Quinn also alleges Defendant Warden May confirmed that he instructed ToCI staff to open, read, copy, and provide the copied version of the contents of legal mail that did not display a control number. (ECF #1 at PageID 6-7).

When deposed, Brian Wittrup, ODRC director's chief policy and strategy advisor, testified state courts are required to affix a control number to all legal mail but mail from federal courts is now exempt from the policy and treated as legal mail even without a control number. (ECF #47 at PageID 400). This change occurred on advice from ODRC's legal department. (*Id.* at PageID 398). This change began after complaints from federal courts about the procedure, though the precise date was uncertain. (*Id.* at PageID 397-98).

7

## LAW AND ANALYSIS

Section 1983 confers a private federal right of action against persons who, acting under color of state law, deprive an individual of a right, privilege, or immunity secured by the Constitution or federal laws. *Burnett v. Grattan,* 468 U.S. 42, 44 n.3 (1984). To maintain a claim under § 1983, a plaintiff must establish a deprivation of rights secured by the Constitution or federal laws and that the deprivation was caused by a person acting under color of state law. *Tahfs v. Proctor,* 316 F.3d 584, 590 (6th Cir. 2003).

Mr. Quinn alleges Defendants processed pieces of legal mail from the Supreme Court of Ohio and the federal court as regular mail.[1] (ECF #1 at PageID 3-4). He alleges his legal mail was opened outside his presence, the contents were examined, and he received copies instead of the original documents. (*Id.*). Mr. Quinn did not specify the contents of these items, except to note they were related to his state court criminal conviction. (*Id.*). He claims he is entitled to summary judgment because Defendants flouted the Supreme Court's and Sixth Circuit's holdings by opening mail from the state and federal courts outside of his presence. (ECF #43 at PageID 243).

Defendants counter that the new Policy is reasonably related to security and other legitimate penological objectives and their actions thus did not violate Mr. Quinn's constitutional rights. (ECF #44 at PageID 246; ECF #45 at PageID 344). Defendants also claim they are entitled to qualified immunity. (ECF #44 at PageID 255-56). Finally, Defendants claim "[t]o the extent that Plaintiff seeks monetary damages from Defendants in their official capacity," the Eleventh

---

[1] Mr. Quinn claims Defendants have treated other legal mail as regular mail but does not provide more information. (ECF #1 at PageID 7).

8

Amendment bars his claims. (*Id.* at PageID 266). I begin with Defendants' immunity claims and then turn to the First Amendment issue.

I.  **Eleventh Amendment Immunity**

The Eleventh Amendment "bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens." *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993) (citations omitted). This immunity also applies to state officials sued in their official capacity for money damages. *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (citations omitted). This is so because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," *i.e.*, against the state itself. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). To the extent Mr. Quinn seeks monetary damages against Defendant Chambers-Smith in her official capacity, she is immune as a matter of law and entitled to summary judgment in her favor. I therefore **GRANT** this portion of Defendants' summary judgment motion.

II.  **Qualified Immunity**

In seeking to dismiss the Complaint based on qualified immunity, the remaining Defendants argued Mr. Quinn could not meet his burden under **§ 1983** because prison officials may impose restrictions that are reasonably related to security or other legitimate penological objectives. (ECF #8). They maintain that qualified immunity shields them from potential **§ 1983** liability because in implementing the Policy, they did not violate any clearly established statutory or constitutional rights of which a reasonable person would have known. (*Id.*).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

9

rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "When properly applied, the doctrine protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). The plaintiff bears the burden of proving that a clearly established right existed when the defendant's actions took place such that the defendant is not entitled to qualified immunity. *Sallier,* 343 F.3d at 878. In determining whether a constitutional right is clearly established at the time of a defendant's actions, courts "look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within our circuit, and finally to decisions of other circuits." *Buckner v. Kilgore,* 36 F.3d 536, 539 (6th Cir. 1994). While a case directly on point is not required before concluding that the law is clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft,* 563 U.S. at 741.

Judge Helmick determined Defendants were not entitled to qualified immunity because of the Sixth Circuit's express holding in *Sallier* that "mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who specifically requested otherwise." (ECF #23 at PageID 138). Judge Helmick further determined "the facts contained in the record show Defendants' application of the Policy categorically excludes a specific and protected form of communication and disregarded [Mr.] Quinn's explicit request to have his legal mail opened only in his presence." (*Id.*).

Despite Judge Helmick's decision on the matter, Defendants assert that the issue of qualified immunity must be framed as: "whether, at the time of Defendants' conduct, was it clearly established that ODRC Policy 75-MAL-03 violated Plaintiff's First Amendment right to receive

10

legal mail," and that, absent clearly established United States Supreme Court or Sixth Circuit precedent, the response must be no, entitling Defendants to qualified immunity. (ECF #44 at PageID 256). But this formulation of the issue is far narrower than what the Sixth Circuit requires. *See Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (noting a court need not have held that the specific action is unlawful if, in light of preexisting law, the unlawfulness is apparent). I agree with Judge Helmick that the Policy at issue does not square with the Sixth Circuit's express holding in *Sallier*. Moreover, based on *Sallier*, a reasonable person would have known that opening legal mail from a court outside the inmate's presence violates the inmate's First Amendment rights. 343 F.3d at 877 ("[W]e hold that mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise.").

In a final effort to obtain qualified immunity, Defendants assert that ODRC officials consulted counsel on the Policy. (ECF #44 at PageID 257). While the Sixth Circuit recognizes that reliance on advice of counsel may support a claim of qualified immunity, *see York v. Purkey*, 14 F.App'x 628, 633 (6th Cir. 2001) (unpublished), the defense is rare and applied only in "extraordinary circumstances." *Cochran v. Gilliam*, 656 F.3d 300, 309 (6th Cir. 2011). The burden is on the defendant to prove such circumstances. *York*, 14 F.App'x at 633. Four factors are relevant when determining whether reliance on advice of counsel constitutes an extraordinary circumstance: (1) whether the advice was unequivocal and specifically tailored to the particular facts giving rise to the controversy; (2) whether complete information was provided to the advising attorney(s); (3) the prominence and competence of the advising attorney(s); and (4) how soon after the advice was received the disputed action was taken. *Id.* (citing *V-1 Oil Co., v. Wyoming*, 902 F.2d 1482, 1489 (10th Cir. 1990)).

11

Defendants have not adequately established the advice-of-counsel defense. In support, Defendants state only that "prior to the implementation of 75-MAL-03, ODRC officials consulted with counsel." (ECF #44 at PageID 257). Defendants offer no evidence specifically addressing the four factors necessary to establish the defense, rendering it inappropriate to grant summary judgment in their favor on this issue. *See Snyder v. Kohl's Dep't Stores, Inc.*, 580 F.App'x 458, 461 (6th Cir. 2014) (restricting summary judgment in favor of a defendant on a defense is proper where the defendant "established the defense so clearly that no rational jury could have found to the contrary.") (cleaned up).

For these reasons, I **DENY** Defendants' request for summary judgment in their favor based on qualified immunity.

### III.     First Amendment Rights of Prisoners to Legal Mail

Before I turn to the merits of Mr. Quinn's First Amendment claim, there are several important principles that frame the analysis of a prisoner's constitutional claims, the first being that a convicted prisoner does not forfeit all constitutional protections at the prison gate. *Bell v. Wolfish,* 441 U.S. 520, 545 (1979). For example, prisoners receive due process protections, *Wolff,* 418 U.S. 539; enjoy freedom of speech and religion under the First and Fourteenth Amendments, *see Pell v. Procunier,* 417 U.S. 817 (1974); *Cruz v. Beto,* 405 U.S. 319 (1972); and retain the right to petition the government for the redress of grievances, *Johnson v. Avery,* 393 U.S. 483 (1969).

Next is the recognition that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Procunier v. Martinez,* 416 U.S. 396, 405 (1974), *overruled on other grounds, Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989). Running a prison requires expertise, planning, and the commitment of resources, "all of which are peculiarly within the

12

province of the legislative and executive branches of government." *Turner v. Safley*, 482 U.S. 78, 85 (1987). Concerns about the separation of powers among the governmental branches counsels a policy of judicial restraint. *Id.* Therefore, a prisoner's rights may be limited to accommodate the needs and operational realities of the penal institution. *Jones v. N.C. Prisoners' Lab. Union*, 433 U.S. 119, 125-26 (1977); *see Price v. Johnston*, 334 U.S. 266, 285 (1948) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."). Because the realities of running a prison are "complex and difficult," courts give "wide-ranging deference to the decisions of prison administrators." *Jones*, 433 U.S. at 126; *see also Cruz*, 405 U.S. at 321.

In *Turner*, the Supreme Court emphasized these principles and reiterated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Justifying its holding, the Supreme Court noted that "subjecting day-to-day judgments of prison officials" to a less flexible scrutinization "would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* The Sixth Circuit held the same in *Sallier*, stating "a prisoner's right to receive mail is protected by the First Amendment, but prison officials may impose restrictions that are reasonably related to security and other legitimate penological objectives." 343 F.3d at 873 (citation omitted). Prison officials violate a prisoner's First Amendment rights when they open and read incoming mail in an arbitrary and capricious fashion. *See Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986).

When incoming mail is "legal mail," there is a "heightened concern with allowing prison officials unfettered discretion to open and read an inmate's mail because a prison's security needs

13

do not automatically trump a prisoner's First Amendment right to receive mail, especially correspondence that impacts upon or has import for the prisoner's legal rights, the attorney-client privilege, or the right of access to the courts." *Sallier,* 343 F.3d at 874; *see also Kensu v. Haigh,* 87 F.3d 172, 174 (6th Cir. 1996) ("The right of a prisoner to receive materials of a legal nature, which have impact upon or import with respect to that prisoner's legal rights and/or matters, is a basic right recognized and afforded protection by the courts . . . .").

In balancing the prison's needs versus the prisoner's rights, courts have approved policies allowing prison officials to open "legal mail" and inspect it for contraband in the presence of the prisoner. *Wolff,* 418 U.S. at 577; *Sallier,* 343 F.3d at 877 ("In order to guard against the possibility of a chilling effect on a prisoner's exercise of his or her First Amendment rights and to protect the right to access to the courts, we hold that mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise."). In *Wolff,* the Supreme Court considered whether letters from attorneys may be opened by prison authorities in the presence of the inmate or whether such mail must be delivered unopened if normal detection techniques failed to indicate contraband. 418 U.S. at 575. Noting that prison authorities may require additional information "to assure that the letters marked privileged are actually from members of the bar," the Court found it "entirely appropriate that the State require any such communications to be specially marked as originating from an attorney, with his name and address being given, if they are to receive special treatment." *Id.* at 576-77.

With these principles in mind, I turn to Mr. Quinn's claim. He asserts mail from the state and federal courts is "legal mail" and prison officials and employees violated his First Amendment rights when, outside his presence, they opened, read, and copied two pieces of mail, one from a

14

state court and one from a federal court. (ECF #1 at PageID 3-5). According to Sixth Circuit precedent, mail from a court is legal mail and cannot be opened outside the presence of a prisoner who has specifically requested otherwise. *Sallier*, 343 F.3d at 877. Because ODRC's Policy allows prison employees to open mail from state and federal courts without the inmate present if the mail does not have a control number affixed to it, the Policy appears to impinge on Mr. Quinn's First Amendment rights. In light of this impingement, the question becomes whether the Policy withstands constitutional scrutiny.

In *Turner*, the Supreme Court reiterated the standard of review for prison regulations affecting prisoners' constitutional rights: "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. at 89. Several factors are relevant in determining the reasonableness of the regulation at issue. First, there must be a "valid, rational connection" between the prison regulation and the asserted legitimate governmental interest. *Block v. Rutherford*, 468 U.S. 576, 586 (1984). The logical connection between the regulation and the objective cannot be "so remote as to render the policy arbitrary or irrational," and the objective must be "legitimate and neutral." *Turner*, 482 U.S. at 89-90. The remaining factors are considerations that must be balanced together: (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 90-91. The burden does not lie with the defendant to

15

prove the validity of prison regulations; it is the prisoner's burden to disprove it. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

As to the first factor, I find no genuine dispute that there is a valid, rational connection between the Policy and the legitimate government interest asserted to justify it. According to ODRC's chief of strategy and policy, the Policy was implemented to reduce the illegal conveyance of contraband through legal mail. (ECF #47 at PageID 378). Courts have consistently held that the maintenance of prison security and prevention of contraband from entering the prison are "legitimate penological" interests. *See Turner*, 482 U.S. at 92-93; *Bell*, 441 U.S. at 550 (describing the smuggling of contraband into a prison through books as "an obvious security problem"). Affidavits from two other ODRC officials state that drug contraband in the form of drug-saturated legal documents have been transported into ODRC prisons through fraudulently marked "legal mail" and prior methods of detecting contraband in legal mail have proved ineffective. (ECF #44-1 at PageID 270; ECF #44-6 at PageID 294-96). Delivering contraband via mail was not difficult because mail qualified as legal mail if it contained a legal mail stamp and bore a return address to an attorney, a public service law office, a legal clinic, a court, or the correctional institution inspection committee, *see* Ohio Admin. Code § 5120-9-17(B)(2) (effective through April 7, 2022), requirements that can be readily met by someone intending to convey contraband into a prison. According to Defendants, "the process of registering, being verified, and obtaining control numbers for each piece of legal mail significantly decreased the overall amount of legal mail coming into institutions" and "significantly decreased the volume of contraband from physically entering the facility through legal mail." (ECF #44-1 at PageID 271). Based on this undisputed evidence, the requirement to register for and affix a control number to legal mail allows prison

16

officials to verify that the sender is a known legal entity, and not a nefarious third-party attempting to introduce contraband. Thus, I conclude there is no genuine dispute that the Policy is reasonably related to legitimate security concerns.

Having determined the Policy bears a rational relationship to a legitimate penological interest, I consider whether prisoners have other ways to exercise their constitutional rights. If no alternative means of exercising the circumscribed right exists, that fact is not conclusive, but it is some evidence that the regulation is unreasonable. *Overton*, 539 U.S. at 135. This factor is satisfied if other means of expression related to the right are available. *Thornburgh*, 490 U.S. at 417-18. *Turner* does not require that the alternative means fulfill the prisoner's exact request. *See* 482 U.S. at 92. According to Defendants, the Policy itself presents prisoners with alternative means to have mail from courts opened in their presence simply by requesting that courts obtain and affix control numbers to legal mail sent to inmates. (ECF #44 at PageID 261).

This same argument satisfied *Turner's* second factor in *Fontroy v. Beard*, 559 F.3d 173 (3rd Cir. 2009), where a prisoner challenged a substantially similar Pennsylvania prison regulation requiring attorneys and courts to affix control numbers to a prisoner's legal mail. *See* 559 F.3d at 174-76. In that case, the Third Circuit determined inmates have other ways to ensure their First Amendment rights are not infringed because "[c]ontrol [n]umbers are easily obtained upon request and, when used, allow the inmates to communicate with attorneys and courts just as they did under the [] old mail policy." *Id.* at 180. The *Fontroy* Court recognized the procedure for incoming mail from a court is even more onerous than for other legal mail, noting that prisoners cannot require courts to apply for and use a control number, "some attorneys and all courts" had refused to do so, and, "unlike most attorney communications, most incoming court correspondence either

17

cannot or will not be made by phone or in person." *Id.* Despite the "less-than-ideal" means of accommodating the inmates' First Amendment rights, the Third Circuit determined that following the new mail procedure is an available alternative. *Id.* at 180-81. I conclude the same. There is thus no genuine dispute that there is an available alternative means to accommodate prisoners' right to mail.

As to the third factor, courts are instructed to be particularly deferential to the informed discretion of corrections officials when accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or prison staff. *Turner,* 482 U.S. at 90. Defendants contend the Policy has curtailed the conveyance of drug contraband into ODRC institutions, led to the elimination of hundreds of invalid registrations for attorneys and law firms, increased overall security and safety for the institutions, employees, and community partners, and allows for better allocation of ODRC employee time. (ECF #44-6 at PageID 297). Accordingly, not enforcing the Policy and returning to the old mail policy "would cause a negative ripple effect on other inmates and prison staff by returning to ineffective contraband detective methods, creating the potential for increased contraband in the prisons, increased exposure to staff coming into contact with illicit and dangerous substances, and increased time spent by staff searching for contraband potentially contained in the legal mail." (ECF #44 at PageID 262). The Policy appears to have improved the factor that prompted the change in the first place—how readily contraband can be disguised as legal mail, thus bypassing the more intensive methods by which regular mail is processed (including opening, reading, and providing copies to inmates) and introduced into the prison population. As Defendants suggest, returning to the old mail policy would cause a "ripple effect" on prison staff, inmates, and prison resources generally. Give the required deference to ODRC's informed

discretion and the lack of evidence contradicting Defendant's testimony, I conclude there is no genuine dispute that enjoining the Policy will have a significant ripple effect on prison operations.

Finally, I consider whether there are ready alternatives available that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. The lack of ready alternatives is evidence of the reasonableness of a prison regulation, while the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable but is an "exaggerated response" to prison concerns. *Turner*, 482 U.S. at 90 (citation omitted). However, "[t]his is not a 'least restrictive alternative' test" and "prison officials do not have to set up and shoot down every conceivable alternative method of accommodating [a] constitutional complaint." *Id.* at 90-91 (cleaned up). But if the inmate "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests," then "a court may consider that as evidence the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. As an alternative solution, Mr. Quinn suggests that "any mail that appears to be legal mail be opened in the presence of the recipient," which is essentially a return to the old mail policy. (ECF #46 at PageID 366). The undisputed evidence confirms the Policy was implemented in part to deter unidentified third parties from sending to inmates contraband disguised as legal mail, such as drug-saturated documents, a significant weakness in jail safety and security. Accordingly, a return to the old system cannot be achieved at a *de minimis* cost to valid penological interests. I thus conclude there is no genuine dispute that there is no obvious, easy alternative to the Policy.

There is no dispute that all four *Turner* factors support a finding of reasonableness, and therefore no reasonable jury could conclude a First Amendment violation occurred. Consequently, Mr. Quinn is not entitled to summary judgment on his First Amendment claim because he has

19

failed to show a constitutional violation and thus has not shown he is entitled to judgment as a matter of law. On the other hand, viewing the facts in a light most favorable to Mr. Quinn, Defendants have proved the prison regulation is reasonable in accordance with each of the *Turner* factors and Mr. Quinn has failed to establish a genuine dispute of material fact such that a reasonable jury could return a verdict in his favor. Defendants are thus entitled to summary judgment on Mr. Quinn's First Amendment claim. Mr. Quinn's request for declaratory judgment that Defendants violated his constitutional rights is therefore denied.

## CONCLUSION

For these reasons, Mr. Quinn's motion for summary judgment on his remaining First Amendment claim is **DENIED**. I **GRANT IN PART** the Defendants' cross-motion for summary judgment on the First Amendment claim but **DENY** summary judgment as it relates to Defendants' claim of qualified immunity. I also **GRANT** summary judgment for Defendant Annette Chambers-Smith in her official capacity. This terminates all aspects of the case and the Clerk is therefore directed to close it.

Dated: February 26, 2025

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

20